FILED

2025 Dec-16  AM 09:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 18

## SECOND FORBEARANCE AGREEMENT

**THIS SECOND FORBEARANCE AGREEMENT** ("Agreement") is made this 18th day of June, 2025 (the "Effective Date"), by and among **CONTOUR CALLINGTON AL LLC**, a Delaware limited liability company ("Callington"), **CONTOUR CARLYLE AL LLC**, a Delaware limited liability company ("Carlyle", and collectively with Callington, the "Borrower"), the parties signing this Agreement as guarantors (each a "Guarantor" and collectively, the "Guarantors"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION** ("Bank").

## RECITALS

A.      Bank, Borrower and Guarantors are party to, among others, the documents as set forth on **Exhibit A** attached hereto and made a part hereof by this reference, all of which, as amended and modified from time to time, including as amended by this Agreement, are referred to collectively as the "Loan Documents". All amounts due to Bank under the Note and the Loan Documents, including costs and expenses, are referred to herein as the "Indebtedness". All duties and obligations of Borrower and Guarantors under the Loan Documents, including payment of the Indebtedness, are referred to herein as the "Obligations". Capitalized terms shall have the meanings as set forth in this Agreement, including Exhibit A, or if not defined herein, the meanings ascribed to such terms as in the Loan Documents.

B.      As of June 6, 2025, there was unpaid and owing to Bank under the Note and Loan Documents a balance of **$89,047,277.28**, exclusive of Bank's attorneys' fees and other expenses and costs of collection, as set forth in greater detail on **Exhibit B** hereto.

C.      Borrower and Guarantors acknowledge that Events of Default have occurred under the Loan Documents due to, without limitation, Borrower's failure to comply with the terms of the First Forbearance Agreement (as described in Exhibit A hereto), cure the Events of Default identified in the First Forbearance Agreement, and otherwise pay to Bank the Indebtedness in accordance with the terms of the Loan Documents (collectively, the "Existing Defaults").

D.      Borrower and Guarantors reaffirm, ratify and confirm the Loan Documents and the Obligations as valid and binding. Borrower and Guarantors acknowledge that (i) Bank has duly performed all of its obligations under the Loan Documents, (ii) Bank has no obligation to lend or continue to lend to Borrower, (iii) Bank has provided Borrower and Guarantors with all notices required by the Loan Documents and applicable law; (iv) Bank has duly and properly accelerated the Indebtedness; (v) the Indebtedness is now due and owing to Bank in full from both the Borrower and Guarantors (to the extent of their liability under their Guaranty), without setoff, defense or counter-claim, in law or in equity, of any kind or nature; (vi) the Indebtedness is secured by (A) the "Collateral" as defined in the Security Agreement, which includes all personal property assets of the Borrower, and (B) the "Subject Property" as defined in the Mortgage encumbering the Property (collectively, the "Collateral"); (vii) Bank has the right, without further notice, to enforce all of its rights and remedies under the Loan Documents and applicable law as a result of the Existing Defaults, including without limitation the immediate appointment of a receiver over the Collateral; and (viii) the Indebtedness is guaranteed by the Guarantors pursuant to their respective Guarantees.

F.      On May 21, 2025, Bank commenced a civil action against the Borrower in the United States District Court for the Northern District of Alabama styled *Wells Fargo Bank, N.A., v. Contour Buckingham AL LLC, et al,* Civil Action No. 2:25-CV-00789, seeking recovery of the Indebtedness and the immediate appointment of a receiver over the Collateral, as well as other relief (the "Civil Action").

4935-8526-3693.2

G.      Borrower and Guarantors acknowledge and agree that as a consequence of the Existing Defaults Bank is entitled under the Loan Documents and applicable law to the appointment of a receiver over the Collateral in the Civil Action.

H.      Borrower has represented to Bank that it has applied for refinancing from another lender which refinancing, if consummated, will pay the Indebtedness in full no later than August 31, 2025.

I.      Borrower has also represented to Bank that it has several parties interested in purchasing the Mortgaged Property who have conveyed to Borrower letters of intent proposing to purchase the Mortgaged Property which, if consummated, will pay the Indebtedness in full no later than August 31, 2025.

J.      Borrower and Guarantors have requested, among other things, that the Bank dismiss the Civil Action without prejudice and temporarily forbear from exercising its immediate right to payment of the Indebtedness and enforcement of its collection remedies (including the Bank's right under the Loan Documents and applicable law to the immediate appointment of a receiver over the Collateral) to afford Borrower and Guarantors additional time to attempt to consummate a refinance or otherwise pay the Indebtedness in full. The Bank is willing to consent to the foregoing request by Borrower and Guarantors subject to the terms and conditions set forth in this Agreement.

**BASED UPON THE FOREGOING RECITALS** (which are incorporated as representations, warranties and covenants of the respective parties, as the case may be), and in consideration of the agreements of the parties herein and other good and valuable consideration, the receipt and adequacy of which is acknowledged, the parties agree, in reliance on such recitals and consideration, as follows:

1.      **Forbearance**. Bank agrees to forbear from enforcing its rights and remedies under the Loan Documents until the earlier to occur of (the "Termination Date"): (i) 5:00 p.m. Central Time on August 31, 2025 or (ii) the occurrence of a New Default. Such period from the Effective Date through the Termination Date shall be referred to herein as the "Forbearance Period". Without limiting the generality of the foregoing, during the Forbearance Period, Bank will not (i) initiate proceedings for the collection of the Indebtedness; (ii) file or join in filing an involuntary petition in bankruptcy with respect to the Borrower, or otherwise initiate or participate in similar insolvency reorganization or moratorium proceedings for the benefit of creditors of Borrower or Guarantors; (iii) repossess or sell, through judicial proceedings or otherwise, any of the Collateral, or (iv) initiate proceedings to enforce the Guarantees.

2.      **Forbearance Terms**. To induce Bank to enter into this Agreement, Borrower and Guarantors agree that the Loan Documents are hereby supplemented and modified as follows, which modifications shall supersede and prevail over any conflicting provision of the Loan Documents:

(a)      **Interest Payments.** Borrower shall remit to Bank the sum of **$1,763,994.49** no later than 5 p.m. Central Time on June 24, 2025, the sum of **$881,997.24** no later than 5 p.m. Central Time on July 3, 2025, and the sum of **$715,008.08** no later than 5 p.m. Central Time on July 14, 2025 to be applied by Bank against accrued and unpaid interest at the non-default Note rate (collectively, the "Interest Payments" and each singularly, an "Interest Payment"). For the avoidance of doubt, Borrower and Guarantors (to the extent of their liability under their Guaranty) shall remain liable to Bank for all default interest as provided in the Loan Documents, provided however that such default interest shall be potentially subject to forgiveness by Bank in accordance with Section 12 of this Agreement.

(b)      **Stipulation For Appointment of Receiver.** Borrower and Guarantors hereby acknowledge, agree, covenant, represent and warrant that that Bank shall be entitled to the immediate appointment of a receiver over the Collateral in the event a New Default occurs or the Borrower fails to

2

pay the Indebtedness to Bank in full prior to the expiration of the Forbearance Period. Accordingly, and to effectuate Bank's right to the immediate appointment of a receiver over the Collateral in the event a New Default occurs or the Indebtedness is not paid prior to expiration of the Forbearance Period, Borrower shall deliver to Bank's counsel on the Effective Date the Acceptance of Service of Summons and Complaint and Stipulation for Appointment of a Receiver over the Collateral attached hereto as **Exhibit C** signed by Borrower and its counsel (the "Stipulation") and the Agreed Order Appointing Receiver attached hereto as **Exhibit D** signed by Borrower's counsel (the "Agreed Order"). The executed Stipulation and Agreed Order shall be deposited and held in escrow with Bank's counsel during the Forbearance Period and shall be released from escrow to Bank upon the Termination Date. After the Termination Date, Borrower and Guarantors expressly authorize Bank and its counsel to file the Stipulation and Agreed Order in the Civil Action or any other creditor's action filed by Bank in the future and shall reasonably cooperate with Bank to obtain the court's entry of the Agreed Order. Borrower and Guarantors acknowledge that Bank is relying on their advance consent to the appointment of a receiver herein, that Borrower's and Guarantors' advance consent to the appointment of a receiver herein is material to Bank, and that absent Borrower's and Guarantors' granting of their advance consent to the appointment of a receiver herein Bank would not enter into this Agreement. Borrower and Guarantors further acknowledge and agree that in the event the Indebtedness remains unpaid after the expiration of the Forbearance Period (i) the Collateral will be in imminent danger of loss, waste, diminishment and/or impairment, (ii) Bank will lack an adequate remedy at law, (iii) the harm that Bank will suffer if a receiver is not appointed will greatly outweigh any potential injury to the Borrowers or Guarantors if a receiver is appointed, (iv) Bank is likely to prevail on its claim for recovery of the Indebtedness and will suffer irreparable harm in the event a receiver is not appointed, (v) the interests of the parties will be well served by the appointment of a receiver, (vi) the Farbman Group, including Jonathan S. Margolis, is qualified to serve as receiver over the Collateral, and (vii) any opposition to or failure to cooperate with Bank's request for the appointment of a receiver over the Collateral by Borrower or any Guarantor after the Termination Date shall constitute an "Increased Recourse Event" by a Borrower Party under Section 2(b)(ix) of the Limited Guaranty Agreements.

(c)    **Financial Reporting by Borrower.** Within thirty (30) days after the end of each month, commencing with the month ending May 31, 2025, Borrower shall provide to Bank (i) the consolidated and consolidating operating statement of the Borrower and the Property, and (ii) a copy of the rent roll of the Property. Borrower shall provide the Bank with copies of its filed tax returns for 2023 and 2024 (which, with respect to 2024 can be a filed request for extension if no return has been filed) as soon as available but no later than July 15, 2025. Borrower shall also provide Bank with copies of any purchase offers, letters of intent or sale agreements relating to the Property within five (5) days of receipt of same.

(d)    **Financial Reporting by Guarantors.** Guarantors shall provide Bank with the following financial information as soon as available but no later than July 15, 2025: (i) current personal financial statements, (ii) verification of liquidity, (iii) copies of filed tax returns for 2023 and 2024 (which, with respect to 2024 can be a filed request for extension if no return has been filed), and (iv) CRE property schedules.

(e)    **Pro-Forma Statement of Sources and Uses.** Borrower shall provide Bank with a pro-forma statement of sources and uses for the proposed Citi-Group refinancing on the Effective Date.

(f)    **Cross-collateralization.** The Loan Documents, including the Mortgage and Security Agreement, are hereby amended to provide that any and all collateral securing the Loan shall also secure all obligations owed to Bank by Borrower's affiliate, Contour Buckingham AL LLC. Borrower will reasonably cooperate with Bank to execute a formal amendment to the Mortgage reflecting same on or before July 14, 2025, for recordation in the public records.

3

4935-8526-3693.2

3.    **Collateral Security; Cash Management.**

(a)    Borrower and Guarantors hereby confirm and grant to Bank continuing perfected security interests in and mortgage liens on the Collateral as collateral security for the Obligations.

(b)    Borrower and Guarantors are reminded, and hereby confirm and agree, to maintain all of Borrower's primary deposit accounts and other traditional banking relationships with the Bank, which includes without limitation, directing all rents, payments and other amounts received from tenants of the Property or otherwise pertaining to the Property, solely to deposit accounts at the Bank.

4.    **Conditions Precedent.**    Borrower and Guarantors understand and agree that this Agreement shall not be effective and Bank shall have no obligation to forbear or to continue to forbear from exercising its rights and remedies under the Loan Documents unless and until each of the following conditions precedent has been satisfied or waived by Bank in its sole discretion, for whose sole benefit such conditions exist, with Bank's determination as to whether they have been timely satisfied being conclusive absent manifest error:

(a)    **Documents.**    Borrower and Guarantors shall have executed and delivered this Agreement and such other documents and instruments required by the Bank in connection with this Agreement, all in form and content acceptable to Bank in its sole discretion.

(b)    **Stipulation and Agreed Order for Appointment of Receiver.**    Borrower shall have delivered to Borrower's counsel the Stipulation and Agreed Order in compliance with Section 2(b) of this Agreement.

5.    **Waiver and Release of All Claims and Defenses.**    Borrower and Guarantors represent and warrant that they are not aware of any claims or causes of action against Bank or any of its affiliates, successors or assigns, and that they have no defenses, offsets or counterclaims with respect to the Obligations.    Notwithstanding this representation and as further consideration for the agreements and understandings herein, Borrower and Guarantors, on behalf of themselves and their respective employees, agents, executors, heirs, successors and assigns (the "Releasing Parties"), hereby release Bank and its predecessors, officers, directors, employees, agents, attorneys, affiliates, subsidiaries, successors and assigns (the "Released Parties"), from any liability, claim, right or cause of action which now exists or hereafter arises as a result of acts, omissions or events occurring on or prior to the date hereof, whether known or unknown, including but not limited to claims arising from or in any way related to this Agreement, the Loan Documents, all transactions relating to this Agreement or any of the Loan Documents or the business relationship, or any other transactions or dealings, among the Releasing Parties or any of them and the Released Parties or any of them. Notwithstanding anything to the contrary in this Agreement, the scope of the above waiver and release by Guarantors shall be limited to Bank's lending and/or banking relationship with the Borrower and the Guarantors and shall not extend to Bank's lending and/or banking relationship with any affiliates of Borrower or Guarantors.

6.    **Reaffirmation of Guarantees.**    Each Guarantor acknowledges and agrees to the continuing authenticity and enforceability of its respective Guaranty and ratifies and confirms its respective Guaranty in its entirety. Each Guarantor acknowledges and agrees that the Guarantees secure and continue to secure the payment and/or satisfaction of all of the Obligations. Guarantors confirm that each Guaranty shall remain in full force and effect until the Indebtedness is fully paid, all of Borrower's and Guarantors' obligations to Bank are fully satisfied and Borrower and Guarantors are discharged hereunder and under the Loan Documents. As of the date hereof, Guarantors have no claims or defenses of any kind by way of offset or otherwise to their obligations under their respective Guaranty. Guarantors waive any and all defenses arising by reason of (i) any and all amendments or modifications of any

4

4935-8526-3693.2

document, (ii) any and all alterations, accelerations, extensions or other changes in the time or decreases in the rate of performance, (iii) any and all increases or decreases in the rate of interest or other charges, (iv) the release, substitution or addition of any collateral, borrower, or guarantor, (v) any failure of Bank to give notice of default to any borrower or guarantor, (vi) any failure of Bank to pursue any borrower or guarantor or any property of any borrower or guarantor with due diligence, (vii) any failure of Bank to resort to collateral or remedies which may be available to it, and (viii) any and all defenses arising out of the guarantor-principal relationship, and the same shall not operate to release any guarantor hereunder.

7. **No Course of Dealing**. Borrower and Guarantors acknowledge, understand and agree that Bank is under no duty or obligation of any kind whatsoever to engage in discussions regarding, or to extend or grant to them, any additional period of forbearance after expiration of the Forbearance Period. No course of performance, course of dealing or trade usage is intended by, nor shall be deemed to have occurred, as a result of (i) the agreements of Bank as set forth herein; (ii) the failure of Bank to enforce any rights upon the occurrence of a New Default; (iii) the acceptance by Bank of any late payment or performance of any requirement herein; or (iv) any other act or omission by Bank.

8. **Indebtedness Remains Due; No Waiver or Cure of the Existing Defaults**. Borrower and Guarantors agree and acknowledge that (i) notwithstanding the current maturity date of the Note, the Indebtedness shall continue to be due and payable in full subject only to Bank's agreement to forbear until the Termination Date as set forth herein, at which point the Indebtedness shall be due and payable in full, and (ii) neither this Agreement nor any payment of the Indebtedness (other than payment in full) nor any act of Bank (other than in a writing expressly so stating) shall constitute a waiver or cure of the Existing Defaults.

9. **Representations and Warranties**. Borrower and Guarantors hereby represent and warrant to Bank as follows:

(a) **Recitals**. The Recitals in this Agreement are true and correct in all material respects.

(b) **Representations Still True**. All representations and warranties of Borrower and Guarantors in the Loan Documents remain true in all material respects, and the Borrower and Guarantors reaffirm such representations and warranties, in all material respects as of the date hereof.

(c) **Organization Documents; No Ownership Changes**. Since January 27, 2023, there have been no amendments to the organizational or governing documents of the Borrower and there have been no changes in the ownership of the equity interests in the Borrower.

(d) **Bankruptcy.**

(i) Statement of Intent. Borrower and Guarantors each warrant and represent that Borrower has no present intent (i) to file any voluntary petition in bankruptcy under any Chapter of the Bankruptcy Code, nor do they have any knowledge that the filing of any involuntary petition in bankruptcy against Borrower is threatened or imminent or (ii) to seek relief, protection, reorganization, liquidation, dissolution, or similar relief for debtors under any federal, state, or local law, or in equity, or (iii) to cause Borrower's respective assets to be the subject of any bankruptcy or insolvency proceedings or the property of any bankruptcy or insolvency estate.

(ii) Relief From Stay. Borrower represents and warrants that in the event some or all of the Collateral shall become the subject of any bankruptcy or insolvency estate, then

5

4935-8526-3693.2

(i) Borrower shall not oppose any request by Bank to obtain an order from the court granting relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code so as to permit the exercise all of rights and remedies pursuant to the Loan Documents, all security agreements or other loan documents, and at law and in equity, and (ii) the occurrence or existence of any event of default under this Agreement shall, in and of itself, constitute "cause" for relief from the automatic stay pursuant to the provisions of Section 362(d)(1) of the Bankruptcy Code, based on the fact that the non-existence of a bankruptcy proceeding was a material inducement for the entry by Bank into this Agreement.

(iii)   Automatic Stay.  Borrower represents and warrants that in the event of the filing of any voluntary or involuntary petition in bankruptcy by or against any of them, Borrower shall not assert or request that any other party assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce, or inhibit the ability of Lender to enforce any rights or remedies held by virtue of the Loan Documents, or applicable law.

10.   **New Default**.  Upon the occurrence of a default after the date hereof by Borrower or Guarantors for failure to strictly observe or perform under any provision of this Agreement (including timely paying each Interest Payment to Bank) or the Loan Documents ("New Default"), Bank's obligation to forbear shall terminate immediately without the requirement of any notice, and Bank may then proceed to exercise all of its legal rights and remedies under the Loan Documents, including, without limitation, filing the Stipulation and Agreed Order with a court of competent jurisdiction in a newly filed creditor's action.  Notwithstanding any provision of this Agreement to the contrary, any covenant default(s) revealed by the Guarantors' financial reporting provided for in Section 2(d) shall not constitute a New Default.

11.   **Dismissal of the Civil Action Without Prejudice.**  Upon Bank's receipt of the first Interest Payment due on June 24, 2025 as required by Section 2(a) of this Agreement, Bank shall promptly dismiss the Civil Action without prejudice.  If Borrower fails to timely pay to Bank the Interest Payment due on June 24, 2025 it shall constitute a Termination Event, and the Borrower and Guarantors authorize Bank and its counsel to immediately file the Stipulation and Agreed Order in the Civil Action.

12.   **Forgiveness of Default Interest.**  Notwithstanding any other provision to the contrary in this Agreement or the Loan Documents, if Borrower pays to Bank the principal outstanding balance of the Loan, all accrued and unpaid Note interest and all of Bank's out-of-pocket expenses and costs of collection (including Bank's legal fees) prior to the Termination Date, Bank shall forgive payment of all accrued and unpaid default interest and all accrued and unpaid late fees and penalties.  In the event Borrower fails to pay the Indebtedness in full on or before the Termination Date, then all accrued and unpaid default interest shall be due and payable by Borrower, and default interest shall continue to accrue thereafter, in accordance the Loan Documents.

13.   **Miscellaneous Provisions**.

(a)   **Implementation**.  Borrower and Guarantors will execute and deliver, or cause to be executed and delivered, all documents and shall take, or cause to be taken, all steps deemed necessary by the Bank and its counsel to give effect to the terms and conditions of this Agreement and agree to provide hereafter such further documents and assurances as may be requested by the Bank, to carry out the intents and purposes hereof.

6

4935-8526-3693.2

       (b)     **Survival**. All representations, warranties, covenants, agreements, undertakings, waivers and releases of Borrower and Guarantors contained herein shall survive the termination of the Forbearance Period and payment in full of the Indebtedness.

       (c)     **Integration**. This Agreement, together with the Loan Documents, constitutes the entire agreement and understanding among the parties relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings relating to such subject matter. In entering into this Agreement, Borrower and Guarantors acknowledge that they are relying on no statement, representation, warranty, covenant or agreement of any kind made by the Bank or any employee or agent of Bank, except for the agreements of Bank set forth herein.

       (d)     **Amendment**. No amendment, modification, rescission, waiver or release of any provision of this Agreement, nor any extension of the Forbearance Period, shall be effective unless the same shall be in writing and signed by the parties hereto.

       (e)     **Notices**. All notices or demands hereunder to parties hereto shall be sufficient if made in writing upon deposit in the mail, postage prepaid, and addressed to the parties respectively as set forth in the Loan Documents.

       (f)     **Governing Law**. This Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of Michigan, without regard to the choice of law principles of such state.

       (g)     **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors, heirs (where appropriate), trustees and assigns; provided, however, that the foregoing shall not authorize any assignment by Borrower or Guarantors of any rights or duties hereunder and no such assignment shall be permitted. Bank may assign its interest in this Agreement and the Loan Documents at any time.

       (h)     **Voluntary and Informed Execution. BORROWER AND GUARANTORS ACKNOWLEDGE THAT THEY HAVE HAD AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL WITH RESPECT TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND BORROWER AND GUARANTORS ACKNOWLEDGE AND AGREE THAT (I) EACH OF THE COVENANTS, WAIVERS AND RELEASES SET FORTH HEREIN WERE KNOWINGLY AND VOLUNTARILY MADE; (II) THE OBLIGATIONS OF BANK HEREUNDER SHALL BE STRICTLY CONSTRUED AND SHALL BE EXPRESSLY SUBJECT TO BORROWER'S AND GUARANTORS' COMPLIANCE IN ALL RESPECTS WITH THE TERMS AND CONDITIONS HEREBY SET FORTH; AND (III) NO REPRESENTATIVE OF BANK HAS WAIVED OR MODIFIED ANY OF THE PROVISIONS OF THIS AGREEMENT AS OF THE DATE HEREOF AND NO SUCH WAIVER OR MODIFICATION FOLLOWING THE DATE HEREOF SHALL BE EFFECTIVE UNLESS MADE IN ACCORDANCE WITH THIS AGREEMENT.**

       (i)     **Ratification of Loan Documents**. Except as expressly amended hereby, Borrower and Guarantors agree that the Loan Documents are ratified and confirmed and shall remain in full force and effect and that they have no set off, counterclaim, defense or other claim or dispute with respect to any of the foregoing. Borrower and Guarantors further acknowledge and agree that all Loan Documents to which they are a party secure all of the Obligations and all other obligations and liabilities described in such Loan Documents as secured.

7

4935-8526-3693.2

(j)    **Performance.** Borrower and Guarantors acknowledge and agree that Bank has fully performed all of its obligations under all Loan Documents, and that all actions taken by Bank are reasonable and appropriate under the circumstances and within its rights under the Loan Documents.

(k)    **Counterparts; Facsimile Signatures.** This Agreement may be executed in one or more counterparts, all of which collectively shall constitute a single document; and, a facsimile signature shall be effective as an original signature.

(l)    **Waiver of Jury Trial.**   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY OTHER DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS; IT BEING ACKNOWLEDGED AND AGREED THAT ANY ISSUES OF FACT IN ANY SUCH ACTION ARE MORE APPROPRIATELY DETERMINED BY THE COURTS. EACH PARTY HERETO FURTHER ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

(m)    **Consent to Jurisdiction and Venue.**  Each Party to this Agreement consents to the jurisdiction of the United States District Court for the Northern District of Alabama, for adjudication of any dispute between Bank and Borrower and/or Guarantors, under any theory of law in connection with, arising out of, or otherwise relating to the Loan, the Loan Documents or this Agreement, and any related transactions, and agree that venue shall be proper in such court to the exclusion of the courts in any other district, state or country.  The provisions of this Paragraph shall survive the payment of Borrower's Indebtedness under the Loan Documents.

## [SIGNATURES ON FOLLOWING PAGE]

8

4935-8526-3693.2

IN WITNESS WHEREOF, the undersigned execute this Agreement effective the day and year first written above.

BORROWERS:

**CONTOUR CALLINGTON AL LLC,**
a Delaware limited liability company

By:_____
     David Dedvukaj
Title:   Manager

**CONTOUR CARLYLE AL LLC,**
a Delaware limited liability company

By:_____
     David Dedvukaj
Title:   Manager

GUARANTORS:

_____
David Dedvukaj, individually

_____
Joseph A. Nathan, individually and as Trustee of the
Joseph A. Nathan Living Trust Dated December 30, 1996

BANK:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By:_____
     David Arreola
Title:   Executive Director, Real Estate Managed Assets Group

9

4935-8526-3693.2

IN WITNESS WHEREOF, the undersigned execute this Agreement effective the day and year first written above.

BORROWERS:

**CONTOUR CALLINGTON AL LLC,**
a Delaware limited liability company

By:_____
　　　David Dedvukaj
Title:　Manager

**CONTOUR CARLYLE AL LLC,**
a Delaware limited liability company

By:_____
　　　David Dedvukaj
Title:　Manager

GUARANTORS:

_____
David Dedvukaj, individually

_____
Joseph A. Nathan, individually and as Trustee of the
Joseph A. Nathan Living Trust Dated December 30, 1996

BANK:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By:_____
　　　David Arreola
Title:　Executive Director, Real Estate Managed Assets Group

9

4935-8526-3693.2

**Exhibit A**
**to**
**Second Forbearance Agreement**

**List of Loan Documents**

The "Loan Documents" include the following (as each of the foregoing has been amended, restated, modified or otherwise supplemented from time to time), each dated as of January 27, 2023, unless otherwise specified:

1.   Credit Agreement between Borrower and the Bank (the "Credit Agreement");

2.   Term Loan Note made by Borrower in favor of the Bank with a stated principal amount of $85,000,000 (the "Note");

3.   Security Agreement made by Borrower in favor of Bank (the "Security Agreement");

4.   Limited Guaranty made by Joseph A. Nathan, individually and as Trustee of the Joseph A. Nathan Living Trust dated December 30, 1996 in favor of the Bank;

5.   Limited Guaranty made by David Dedvukaj, individually, in favor of the Bank (together with #4 above, the "Guarantees", each also referred to herein as a "Guaranty");

6.   Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing made by Callington in favor of the Bank, recorded February 7, 2023 in Instrument #2023009940 of the records in the Office of the Judge of Probate of Jefferson County, Alabama;

7.   Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing made by Carlyle in favor of the Bank, recorded February 7, 2023 in Instrument #2023009941 of the records in the Office of the Judge of Probate of Jefferson County, Alabama (together with #6 above, the "Mortgages", each also referred to herein as a "Mortgage");

8.   Environmental Indemnity Agreement made by Borrower and the Guarantors in favor of the Bank;

9.   Notice of Events of Default and Reservation of Rights Letter dated as of June 10, 2024, delivered by the Bank to Borrower and Guarantors (the "Default Letter");

10.  Forbearance Agreement dated as of June 25, 2024 between Borrower and Bank (the "First Forbearance Agreement");

11.  Demand for Payment Letter dated as of February 10, 2025 (the "Demand for Payment Letter"); and

12.  All other documents, agreements, instruments and assignments executed in connection with the foregoing.

4935-8526-3693.2

**Exhibit B**
**to**
**Second Forbearance Agreement**

**Statement of Indebtedness**
**(exclusive of attorneys' fees, expenses and costs)**
**As of June 6, 2025**

| | | | | |
|---|---|---|---|---|
| Principal | | | | $84,029,452.01 |
| Interest | 2/8/2025 | TO | 6/6/2025 | $1,783,674.95 |
| Interest | 6/9/2024 | TO | 6/6/2025 | $3,233,420.09 |
| Reconveyance Fee | | | | $130.00 |
| Notary Fee | | | | $10.00 |
| Estimated Prepayment Fee | | | | $460.23 |
| County Recording Fees | | | | $32.00 |
| UCC Termination | | | | $98.00 |
| | | | **Total Payoff:** | **$89,047,277.28** |

4935-8526-3693.2

**Exhibit C**
**to**
**Second Forbearance Agreement**

<u>**Acceptance of Service of Summons and Complaint**</u>
<u>**and Stipulation For Appointment of Receiver**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO: |
| | § | |
| CONTOUR CALLINGTON AL LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**ACCEPTANCE OF SERVICE OF SUMMONS AND COMPLAINT
AND STIPULATION FOR APPOINTMENT OF RECEIVER**

The Defendant, CONTOUR CALLINGTON AL LLC, by and through its undersigned

manager, David Dedvukaj, and counsel, The Woodcrest Group, LLC, hereby (i) accepts service

of the Summons and Complaint in the above-captioned civil action and (ii) consents to the

appointment of the Farbman Group as receiver, as requested by the Plaintiff, Wells Fargo Bank,

in its Motion for Appointment of Receiver.

| | |
|---|---|
| COUNSEL FOR CONTOUR CALLINGTON AL LLC<br>Charles Denaburg, Esq.<br>Frank C. Galloway III, Esq.<br>David Schoel, Esq.<br>The Woodcrest Group, LLC<br>2200 Woodcrest Place, Suite 315<br>Birmingham, AL 35209<br>Phone: 205-807-9763<br>cld@woodcrestgroup.law<br>fcg3@woodcrestgroup.law<br>dds@woodcrestgroup.law | David Dedvukaj<br>Manager of Contour Callington AL LLC<br>40950 Woodward Avenue, Suite 300<br>Bloomfield Hills, MI 48304<br>David@ContourCompanies.com |

4919-4052-7693.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A., | § § § § | |
| Plaintiff, | § | |
| v. | § § | CIVIL ACTION NO: |
| CONTOUR CARLYLE AL LLC, | § § § | |
| Defendant. | § § § | |

### ACCEPTANCE OF SERVICE OF SUMMONS AND COMPLAINT AND STIPULATION FOR APPOINTMENT OF RECEIVER

The Defendant, CONTOUR CARLYLE AL LLC, by and through its undersigned

manager, David Dedvukaj, and counsel, The Woodcrest Group, LLC, hereby (i) accepts service

of the Summons and Complaint in the above-captioned civil action and (ii) consents to the

appointment of the Farbman Group as receiver, as requested by the Plaintiff, Wells Fargo Bank,

in its Motion for Appointment of Receiver.

| | |
|---|---|
| COUNSEL FOR CONTOUR CARLYLE AL LLC<br>Charles Denaburg, Esq.<br>Frank C. Galloway III, Esq.<br>David Schoel, Esq.<br>The Woodcrest Group, LLC<br>2200 Woodcrest Place, Suite 315<br>Birmingham, AL 35209<br>Phone: 205-807-9763<br>cld@woodcrestgroup.law<br>fcg3@woodcrestgroup.law<br>dds@woodcrestgroup.law | David Dedvukaj<br>Manager of Contour Callington AL LLC<br>40950 Woodward Avenue, Suite 300<br>Bloomfield Hills, MI 48304<br>David@ContourCompanies.com |

4922-2102-1773.1

**Exhibit D**
**to**
**Second Forbearance Agreement**

**Agreed Order Appointing Receiver**

4935-8526-3693.2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **WELLS FARGO BANK, N.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO:** |
| | § | |
| **CONTOUR BUCKINGHAM AL LLC,** | § | |
| **CONTOUR CALLINGTON AL LLC, and** | § | |
| **CONTOUR CARLYLE AL LLC,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>AGREED ORDER APPOINTING RECEIVER</u>

Pending before the Court is the *Motion for Appointment of Receiver* (the "***Receiver Motion***") filed by Plaintiff Wells Fargo Bank, N.A.  After consideration of the Motion, Brief in Support of Motion for Appointment of Receiver, the Declaration of Jonathon S. Margolis, and the Stipulations for Appointment of Receiver signed by the Defendants, and upon finding that this Court has jurisdiction over the parties and matters raised in the Verified Complaint and Receiver Motion and that venue is proper in this Court; and after due consideration of the entire record in this matter, the Court hereby finds and concludes as follows:

### FINDINGS OF FACT & CONCLUSIONS OF LAW

1.      Wells Fargo Bank, N.A. ("***Lender***") is a national banking association having its principal place of business and main office in the State of South Dakota.  For purposes of diversity jurisdiction, Lender is a citizen of the State of South Dakota. *Wachovia v. Schmidt*, 546 U.S. 303, 318 (2006) (for diversity jurisdiction, a national banking association is "located" in and is a "citizen" of the state in which its main office is located).

4898-2533-7162.3

2.      Contour Buckingham AL LLC ("*Contour Buckingham*" or "*Buckingham*") is a limited liability company organized and existing under the laws of the state of Delaware. No member of Buckingham is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

3.      Contour Callington AL LLC ("*Contour Callington*" or "*Callington*") is a limited liability company organized and existing under the laws of the state of Delaware. No member of Callington is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

4.      Contour Carlyle AL LLC ("*Contour Carlyle*" or "*Carlyle*") is a limited liability company organized and existing under the laws of the state of Delaware. No member of Carlyle is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

**A. The Buckingham Loan**

5.      Contour Buckingham is the owner of a residential apartment complex situated at 114 Aspen Circle, Homewood, Alabama, commonly known as "The Park at Buckingham" (the "*Buckingham Facility*").

6.      On or about September 30, 2022, Lender made a term loan to Buckingham in the original principal amount of $60,000,000.00 (the "*Buckingham Loan*").

7.      The Buckingham Loan is evidenced by, among other things, that certain Term Loan Note dated September 30, 2022, executed by Buckingham in favor of Lender, as amended by that certain First Amendment to Term Loan Note dated May 31, 2023 (collectively as amended, the "*Buckingham Note*").

8.      To induce Lender to make the Buckingham Loan, Buckingham executed a Security Agreement dated September 30, 2022 in favor of Lender, granting Lender a first-priority security interest in all personal property of Buckingham, including, but not limited to, all

2

accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, and deposit accounts described in the Security Agreement and Schedule 1 to the Security Agreement (collectively, the *"Buckingham Security Agreement"*).

9.      Lender perfected its security interest in the collateral described in the Buckingham Security Agreement through filing a UCC financing statement with the Delaware Department of State as U.C.C. Initial Filing No. 20228185712 (the *"Buckingham UCC-1"*).

10.     As further security for Buckingham's obligations to Lender in connection with the Buckingham Loan, Buckingham executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated September 30, 2022, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on October 6, 2022 as Instrument No. 2022104961 (the *"Buckingham Mortgage"*). The Buckingham Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Buckingham Facility, as more particularly described in Exhibit A to the Buckingham Mortgage.

11.     The Buckingham Note, the Buckingham Security Agreement, the Buckingham UCC-1, the Buckingham Mortgage, the Buckingham Forbearance Agreement (as hereinafter defined) and any and all other documents evidencing, describing, securing, or relating to the Buckingham Loan are herein referred to as the *"Buckingham Loan Documents."* The real and personal property collateral described in the Buckingham Loan Documents is collectively referred to herein as the *"Buckingham Collateral."*

12.     Pursuant to the terms of the Buckingham Loan Documents, the Buckingham Collateral secures all of Buckingham's obligations under the Buckingham Loan Documents.

3

4898-2533-7162.3

## B. The Callington/Carlyle Loan

13. Contour Callington is the owner of a residential apartment complex situated at 700 Aspen Drive, Birmingham, Alabama, commonly known as "The Park at Callington" (the *"Callington Facility"*).

14. Contour Carlyle is the owner of a residential apartment complex situated at 200 Robert Jemison Drive, Birmingham, Alabama, commonly known as "The Park at Carlyle" (the *"Carlyle Facility"* and, collectively with the Buckingham Facility and the Callington Facility, the *"Facilities"*).

15. On or about January 27, 2023, Lender made a term loan to Callington and Carlyle in the original principal amount of $85,000,000.00 (the *"Callington/Carlyle Loan"*).

16. The Callington/Carlyle Loan is evidenced by, among other things, that certain Term Loan Note dated January 27, 2023 executed by Callington and Carlyle in favor of Lender, as amended by that certain First Amendment to Term Loan Note dated May 31, 2023, and as further amended by that certain Second Amendment to Term Loan Note dated August 22, 2023 (collectively as amended, the *"Callington/Carlyle Note"*).

17. To induce Lender to make the Callington/Carlyle Loan, Callington and Carlyle executed a Security Agreement dated January 27, 2023 in favor of Lender, granting Lender a security interest in all of their respective personal property, including, but not limited to, all accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, and deposit accounts described in the Security Agreement and Schedule 1 to the Security Agreement (collectively, the *"Callington/Carlyle Security Agreement"*).

4

4898-2533-7162.3

18. Lender perfected its security interest in the collateral described in the Callington/Carlyle Security Agreement through the filing of two (2) UCC financing statements with the Delaware Department of State: (1) U.C.C. Initial Filing No. 20230733096 (the *"Callington UCC-1"*); and (2) U.C.C. Initial Filing No. 20230733195 (the *"Carlyle UCC-1"*).

19. As further security for Callington's obligations to Lender in connection with the Callington/Carlyle Loan, Callington executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated January 27, 2023, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on February 7, 2023 as Instrument No. 2023009940 (the *"Callington Mortgage"*). The Callington Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Callington Facility, as more particularly described in Exhibit A to the Callington Mortgage.

20. As further security for Carlyle's obligations to Lender in connection with the Callington/Carlyle Loan, Carlyle executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated January 27, 2023, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on February 7, 2023 as Instrument No. 2023009941 (the *"Carlyle Mortgage"*). The Carlyle Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Carlyle Facility, as more particularly described in Exhibit A to the Carlyle Mortgage.

21. The Callington/Carlyle Note, the Callington/Carlyle Security Agreement, the Callington UCC-1, the Carlyle UCC-1, the Callington Mortgage, the Carlyle Mortgage, the Callington/Carlyle Forbearance Agreement (as hereinafter defined) and any and all other documents evidencing, describing, securing, or relating to the Callington/Carlyle Loan are herein referred to as the *"Callington/Carlyle Loan Documents."* The real and personal property

5

collateral described in the Callington/Carlyle Loan Documents is collectively referred to herein as the **"Callington/Carlyle Collateral"**.

22.    Pursuant to the terms of the Callington/Carlyle Loan Documents, the Callington/Carlyle Collateral secures all of Callington and Carlyle's obligations under the Callington/Carlyle Loan Documents.

**C.  The Contour Borrowers' Events of Default, Acceleration, and Forbearance**

23.    Buckingham, Callington, and Carlyle (collectively, the **"Contour Borrowers"**) have failed to pay and perform their respective obligations under the Buckingham Loan Documents and Callington/Carlyle Loan Documents.

24.    The following defaults occurred and remain outstanding under the Buckingham Loan Documents (collectively, the **"Buckingham Pre-Forbearance Defaults"**):

a.    Buckingham failed to remit the May 10, 2024 and June 10, 2024 required payments of principal and interest due under the Buckingham Loan Documents; and

b.    As of the March 31, 2024 test date, Buckingham failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 as required by the Buckingham Loan Documents.

25.    Likewise, Callington and Carlyle failed to remit the April 10, 2024, May 10, 2024, and June 10, 2024 scheduled payments of principal and interest due under the Callington/Carlyle Loan Documents (collectively, the **"Callington/Carlyle Pre-Forbearance Defaults"**).

26.    On June 10, 2024, Lender gave the Contour Borrowers written notice of the Buckingham Pre-Forbearance Defaults and the Callington/Carlyle Pre-Forbearance Defaults.

6

4898-2533-7162.3

27. As a result of the Pre-Forbearance Defaults, Lender entered into Forbearance Agreements with the Contour Borrowers.

28. Lender entered into a Forbearance Agreement with Buckingham dated June 25, 2024 (the *"Buckingham Forbearance Agreement"*), pursuant to which Lender accelerated the entire amount due under the Buckingham Loan Documents but agreed to forbear from exercising its rights and remedies on account of the Buckingham Pre-Forbearance Defaults until August 31, 2024.

29. Under Section 2(a) of the Buckingham Forbearance Agreement, Buckingham agreed to pay the "May 10, 2024 and June 10, 2024 scheduled monthly payments" that were delinquent and "otherwise bring any amounts due or delinquent under the Note current" no later than June 28, 2024.

30. Lender entered into a Forbearance Agreement with Callington and Carlyle on June 25, 2024 (the *"Callington/Carlyle Forbearance Agreement"*), pursuant to which Lender accelerated the entire amount due under the Callington/Carlyle Loan Documents but agreed to forbear from exercising its rights and remedies on account of the Callington/Carlyle Pre-Forbearance Defaults until August 31, 2024.

31. Under Section 2(a) of the Callington/Carlyle Forbearance Agreement, Callington and Carlyle agreed to pay Lender "the April 10, 2024, May 10, 2024, and June 10, 2024 scheduled monthly payments" that were delinquent and "otherwise bring any amounts due or delinquent under the Note current" no later than June 28, 2024.

7

**D. The Contour Borrowers' Forbearance Defaults**

32.    The Contour Borrowers failed to pay and perform their respective obligations to Lender under the Buckingham Forbearance Agreement and the Callington/Carlyle Forbearance Agreement.

33.    The Contour Borrowers also committed new defaults under the Buckingham Loan Documents and the Callington/Carlyle Loan Documents after entering into forbearance agreements with Lender.

34.    Buckingham failed to pay and perform its respective obligations under the Buckingham Forbearance Agreement, and added additional defaults under the Buckingham Loan Documents, including, without limitation, the following (collectively, the **"*Buckingham Forbearance Defaults*"**):

    a.  Contour Buckingham failed to remit required payments of principal and interest due under the Buckingham Loan Documents;

    b.  Contour Buckingham failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 for the March 31, 2024, June 30, 2024, September 30, 2024, and December 31, 2024 calendar quarters; and

    c.  Contour Buckingham failed to pay the 2023 and 2024 real property taxes assessed against the Buckingham Mortgage Property.

35.    Similarly, Callington and Carlyle failed to pay and perform their respective obligations under the Callington/Carlyle Forbearance Agreement and added multiple defaults under the Callington/Carlyle Loan Documents, including, without limitation, the following (collectively, the **"*Callington/Carlyle Forbearance Defaults*"**):

a. Callington and Carlyle failed to remit required payments of principal and interest due under the Callington/Carlyle Loan Documents;

b. Callington and Carlyle failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 for the June 30, 2024, September 30, 2024, and December 31, 2024 calendar quarters; and

c. Callington and Carlyle failed to pay the 2023 and 2024 real property taxes assessed against the Callington and Carlyle Mortgaged Properties.

36.    On February 10, 2025, Lender gave the Contour Borrowers written notice of their Forbearance Defaults under both the Buckingham Loan and the Callington/Carlyle Loan. Lender declared the entire amounts outstanding on both loans to be immediately due and payable and demanded payment in full of the Loans from the Contour Borrowers.

37.    On June 18, 2025, Lender and the Contour Borrowers entered into a Second Forbearance Agreement, pursuant to which Lender granted the Contour Borrowers until the earlier of August 31, 2025 or the occurrence of any new defaults by the Contour Borrowers to repay the Loans in full.  In consideration for Lender's commitment to forbear, the Contour Borrowers agreed to the appointment of a receiver over the Contour Collateral (as defined hereinafter) in the event new defaults occurred and/or they otherwise failed to pay in full their indebtedness to Lender under the Loan Documents within the time period prescribed in the Second Forbearance Agreement.

38.    The Contour Borrowers have breached the Second Forbearance Agreement and remain in default under both the Buckingham Loan Documents and Callington/Carlyle Loan Documents (collectively *"the Contour Loans"*).  As a result, all amounts owing under the Contour Loans are immediately due and payable to Lender.

9

39.    The Contour Loans are secured by the Buckingham Collateral and the Callington/Carlyle Collateral (collectively, the *"Contour Collateral"*).

**B.    Appointment of Receiver**

40.    Lender is entitled to the appointment of a receiver under the express terms of the Buckingham Loan Documents and the Callington/Carlyle Loan Documents (collectively, the *"Contour Loan Documents"*).    Specifically, Sections 5.2 of Buckingham Mortgage, the Callington Mortgage, and the Carlyle Mortgage provide:

> Upon the occurrence of any Default, and at any time thereafter, [Lender] shall have all of the following rights and remedies: ... (d) To apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Subject Property as a matter of strict right and without regard to: (i) the adequacy of the security for the repayment of the Secured Obligations; (ii) the existence of a declaration that the Secured Obligations are immediately due and payable; or (iii) the filing of a notice of default; and Mortgager consents to such appointment.

41.    The Contour Loan Documents are legal, enforceable, and binding contracts, and the Contour Borrowers are each in default of their contractual and legal obligations owing under the Contour Loan Documents.

42.    Additionally, the Contour Borrowers have filed Stipulations for the Appointment of Receiver in this action consenting to the relief requested in the Receiver Motion.

43.    The appointment of a receiver is appropriate where, as here, parties have contractually agreed to a receivership, particularly when, as in this instance, the receiver provisions are clear and unambiguous, and the contracting parties are sophisticated.

44.    Unless a receiver is appointed, Lender will suffer irreparable harm.    Additionally, no adequate legal remedy exists under the circumstances.

45.    Lender and all stakeholders in the Facilities, including the residents, will benefit

10

from the appointment of a receiver experienced in operating, stabilizing and restructuring distressed multi-family properties, under the oversight of this Court. Not only will this help preserve the value of the Contour Collateral and improve the marketability of the Facilities as a going concern, but the appointment of a receiver will provide a continuity of service to the residents through any transition period.

46.     Lender has proven its entitlement to the appointment of a receiver to ensure the economic and efficient operation of the Facilities given that: (a) Lender has a clear contractual right to be protected by the appointment of a receiver; (b) there exists imminent danger that the Facilities or other Contour Collateral will cease operations or diminish in value; (c) legal remedies are inadequate to satisfy Lender's claims; (d) no less drastic equitable remedy exists; and (e) the benefits of the appointment of a receiver outweigh any potential harm flowing therefrom.

47.     Farbman Group ("**_Receiver_**") is qualified to serve as receiver in this matter and has the requisite experience and qualifications to serve as receiver of the Facilities and other Contour Collateral pursuant to the terms of this Order.

48.     Jonathon S. Margolis, Senior Vice President of Asset Management at Farbman Group ("**_Margolis_**"), is similarly qualified and will be responsible in directing the Receiver's duties under this Order.

## ORDER

Based upon the foregoing findings and conclusions, the Receiver Motion is GRANTED. Accordingly, it is ORDERED that:

A.     Farbman Group is appointed as the Receiver over the Receivership Estate (as defined below).

11

4898-2533-7162.3

B.     The Receiver shall provide this Court with its written acceptance to faithfully perform the Receiver's duties as set forth in this Order, and shall file with the Clerk of the Court a surety bond in the amount of $25,000 to be provided by a corporate surety, guaranteeing performance of the Receiver's duties and obligations, the bond to be payable to this Court for loss due to the acts of all agents, servants, or employees of the Receiver.

### The Receivership Estate

C.     Upon entry of this Order and the Receiver's acceptance of its appointment as receiver of the Receivership Estate (as defined below) and posting of the required bond, the Receiver is directed and empowered to take from the Contour Borrowers all rights and powers of the Contour Borrowers with respect to the Facilities, and their administration and operation, including:

i.     the Contour Collateral (as defined hereinabove);

ii.    any and all real or personal property used in or related to the maintenance and operation of the Facilities, including but not limited to all equipment, fixtures, machinery, motor vehicles, automobiles, trucks, other rolling stock, leasehold improvements, tax identification and employer numbers, construction work in progress, supplies, raw materials, inventory, goods, work in process, parts, computers, computer software (including all licenses, leases, documentation, and source codes with respect to the computer software), telecommunication systems, fixtures, furniture, furnishings, office equipment, all tangible property furnished by or used in connection with the Facilities, as well as all rights, easements, and franchises appurtenant thereto (collectively, the "*Physical Assets*");

iii.   any and all cash, cash equivalents, rents, bank accounts, deposit accounts, credits, prepaid expenses, deposits, deferred charges, advance payments, security deposits, prepaid items, funds, securities, investment accounts, accounts receivable, notes, notes receivable, mortgages, security interests, income, revenues derived from the Facilities, insurance claims, insurance proceeds, any and all civil claims, whether actual, contingent, or otherwise, and any and all other rights to receive payments and/or property used in, generated from, or related to the administration, maintenance, and operation of the Facilities as well as all rights, interests, licenses, and franchises related thereto (collectively, the "*Cash Equivalent Assets*");

12

4898-2533-7162.3

iv.    any and all records, documents, rent rolls, accounting records, contracts, leases, and operating data and/or electronically stored information (including any and all computer operating systems in which such information is or may be stored) relating to the operation and management of the Facilities and the Contour Collateral that is in the possession, custody, or control of the Contour Borrowers (collectively, the "***Books and Records***");

v.    any and all leases, contracts, licenses, agreements and permits affecting, or related to, the Facilities or their operation (collectively, the "***Contracts and Licenses***"); and

vi.    any and all of the internet domain names, post office box numbers, telephone and facsimile numbers, and any and all other listings and numbers used by the Contour Borrowers in connection with the operation and management of the Facilities (collectively, the "***Contact Information Assets***"; and together with the Contour Collateral, Physical Assets, Cash Equivalent Assets, Books and Records, and Contracts and Licenses, the "***Receivership Estate***").

D.    The Contour Borrowers and their successors, assigns, agents, officers, directors, stockholders, members, managers, employees, attorneys, accountants, anyone acting for or in concert with the Contour Borrowers, and any persons or entities, including banks, financial or depository institutions, receiving notice of this Order and having possession or control of the Contour Collateral, Books and Records, Cash Equivalent Assets, Contracts, Licenses, Contact Information Assets, the Facilities, and/or any and all Physical Assets are hereby ordered to immediately deliver over to the Receiver: (1) full access to all Books and Records; (2) full and exclusive control over any and all Cash Equivalent Assets (including any information required by a bank or financial or depository institution to enable the Receiver to take exclusive control over any and all Cash Equivalent Assets, e.g. access to online banking), Contracts and Licenses, and Contact Information Assets; and (3) full access to and exclusive control over any and all Physical Assets and the Contour Collateral.

### The Receiver's Authority and Power

E.    Upon the acceptance by the Receiver of its appointment pursuant to this Order, and

13

4898-2533-7162.3

the posting of the required bond, the Receiver is granted the full power and authority to control, manage, administer, operate, and protect the Receivership Estate, and is hereby specifically vested with all statutory and common law powers, rights, and privileges of a receiver necessary to accomplish the purpose of this receivership.

F.    The Receiver is to operate and administer the Receivership Estate in an economical and efficient manner in compliance with the terms and conditions of the Contour Loan Documents (to the extent reasonably feasible) and applicable law.  The Receiver is hereby authorized and directed to recover, collect, operate, maintain, preserve, and manage the Receivership Estate in the best interests of the Receivership Estate's creditors, and to take all action deemed reasonable and necessary to ensure compliance with all applicable requirements imposed by local, state, or federal law.

G.    To that end, by this Order, the Court intends to give, and does hereby give, the Receiver the full power and authority to fulfill its obligations as Receiver of the Receivership Estate, including, but not limited to, the sole and exclusive right and authority to:

i.      take complete and exclusive possession, control, and custody of and to exclusively run, operate, administer, manage, and perform all acts necessary to operate the Receivership Estate in the ordinary course of business, in accordance with the provisions of the Contour Loan Documents and applicable local, state and federal law, including but not limited to entering into, modifying, and administering contracts and agreements for the provision of accommodations and related services to current and prospective residents of the Facilities;

ii.     take possession of all inventory, equipment, and improvements constituting the Facilities, and all books, records, and personal property relating to the Facilities, wherever located;

iii.    take possession of all bank accounts containing funds associated with the Facilities, wherever located, and to open, transfer, and change all bank and trade accounts relating to the Facilities and the Contour Collateral, including accounts to which residents of the Facilities or other third-party payors make payment so that all such accounts are in the name of the Receiver;

iv.     conduct an inventory of all personal property included in the Facilities;

v.      exercise all rights as to ownership of the Facilities subject to the limitations set forth herein;

14

4898-2533-7162.3

vi.      implement operational efficiencies and revenue enhancement programs;

vii.     fix, charge, revise, raise, and maintain rates and charges for services furnished by the Receivership Estate;

viii.    collect rents and revenues derived from the Receivership Estate and apply those rents and revenues to the expenses of operating and maintaining the Receivership Estate in such order and amount as the Receiver, in its business judgment, deems prudent and appropriate, with available resources then applied in such order as required under the Contour Loan Documents;

ix.      make any reasonable reductions or revisions in the Receivership Estate's operating expenses, whether or not in the ordinary course of business;

x.       manage, operate, maintain, and otherwise control all of the Contour Collateral as necessary to prevent diminution of the Contour Collateral's value including, but not limited to: (a) the receipt, collection, possession, and preservation of all accounts, incomes, profits, rents, and revenues; (b) subject to available resources in the Receivership Estate, from the date of this Order, the payment of taxes, insurance, utility charges, and other expenses and costs incurred in managing and preserving the Facilities and the Contour Collateral, including any past due amounts necessary to restore services, coverage or good standing; (c) if determined appropriate, the right to inspect or receive documents necessary for determining, investigating, reporting tax obligations and filing tax returns (provided, however, that the Receiver shall not be obligated or required by this Order to file tax returns on behalf of the Contour Borrowers); and (f) exercising any intangible rights;

xi.      receive, collect, take possession of, and preserve all accounts, incomes, profits, and other revenues generated from and by the Receivership Estate, subject to the requirements of the Contour Loan Documents;

xii.     terminate or modify any currently existing written or oral contract (other than the Contour Loan Documents or tenant leases), with any and all damages arising therefrom to be paid with revenues derived from the Receivership Estate in such amounts and at such times as the Receiver deems prudent in its business judgment;

xiii.    assume and assign any currently existing leases and/or written or oral contracts in accordance with the terms of this Order;

xiv.   enter into new contracts on behalf of the Receivership Estate for goods or services that the Receiver, in its business judgment, deems necessary or advisable for the operation of the Receivership Estate;

xv.    file, investigate, institute, prosecute, defend, compromise, adjust, or intervene in any action or proceeding, legal, equitable, or otherwise, before this Court or any other court, agency, or tribunal, as the Receiver may deem, in its sole business judgment, to be necessary and proper for the protection, maintenance, enhancement, and/or preservation of the Receivership Estate, or to further the provisions of this Order;

xvi.   investigate and determine the nature and extent of any and all prior expenditures that may have been improperly classified and take all reasonable and necessary action to have such expenses properly classified;

15

xvii.   investigate and determine whether all revenues have been properly accounted for and to take all reasonable and necessary action to recover any and all revenues that have been diverted away from the Receivership Estate or otherwise improperly applied and/or handled;

xviii.  institute, prosecute, defend, and settle such legal proceedings as the Receiver deems necessary relating to the recovery, collection, maintenance, protection, or proper care of the Receivership Estate, and to employ counsel therefore;

xix.    hire, discharge, manage, and control such employees and/or staff at the Facilities, except as prohibited by law, as the Receiver determines necessary or advisable;

xx.     permit the Lender and its respective agents and independent contractors and/or professionals to inspect fully the Facilities, their accounts, and all books and records, including records as to the maintenance of any portion of the Facilities, upon reasonable notice to the Receiver;

xxi.    take all such actions and expend all such sums as may be necessary and prudent in the Receiver's business judgment to obtain, maintain in effect, restore, or transfer all Licenses, insurance, zoning approvals and other approvals in an effort to ensure that the Receivership Estate may continue to be used for its intended purpose;

xxii.   enter into and/or terminate, modify, assume, and renew contracts for any insurance with the same or different insurance providers that the Receiver believes, in its sole business judgment, is necessary or advisable for the continued operation of the Receivership Estate in the ordinary course of business as a going concern;

xxiii.  terminate or modify, as the Receiver deems prudent in the exercise of its business judgment, any business activities of, or services provided at or in connection with, the Receivership Estate;

xxiv.   engage professionals in the ordinary course of the Facilities' business, including, but not limited to, attorneys, accountants, communication consultants, investment bankers, consultants, brokers, forensic and investigative accountants, engineers, managers and any other service providers (each a *"Professional"* or *"Service Provider"* as applicable) as the Receiver may, subject to the approval of the Lender, deem necessary or advisable to assist the Receiver in the performance of its duties under this Order and agree to such terms (including financial terms) with respect to such engagements as the Receiver may deem necessary or advisable, without further order of this Court and with the reasonable fees and expenses of such Professionals and Service Providers to be payable on a current basis from the Receivership Estate as operating expenses, subject to the provisions of Section FF below;

xxv.    comply with all requirements of all governmental authorities;

xxvi.   change any and all locks on the Receivership Estate;

xxvii.  generally, do, execute, and perform any other act, deed, matter, or thing whatsoever that the Receiver reasonably believes ought to be done, executed, and performed in and about, or with respect to, the Receivership Estate;

xxviii. take all actions necessary and appropriate to preserve, maintain, renew, and protect all leases, contracts and licenses affecting, or related to, the Facilities or their operation to the extent the Receiver in its sole discretion determines that the said leases, contracts and licenses should be preserved, maintained, renewed, and

16

4898-2533-7162.3

protected, including making all necessary filings with the regulatory bodies and agencies with jurisdiction over the Facilities;

xxix.   execute such documents as are necessary to transfer all leases, contracts and licenses affecting, or related to, the Facilities or their operation to any purchaser of the Facilities, including a purchaser at a non-judicial foreclosure sale which may be conducted by the Lender;

xxx.    pay itself and any Professionals and/or Service Providers such fees (and reimburse such expenses) as are payable in accordance with the terms of this Order, absent contrary order of this Court;

xxxi.   request and receive advances from the Lender on terms mutually agreeable to the Lender and the Receiver for expenses incurred by the Receiver relating to the care, preservation and maintenance of the Receivership Estate. All advances made by the Lender to the Receiver shall be deemed advances under and pursuant to the Contour Loan Documents to protect and preserve the Lender's interest in the Contour Collateral, shall be secured by all of the Contour Collateral, and shall have administrative claim priority against the Receivership Estate ahead of claims arising prior to the Receiver's appointment. Alternatively, the Receiver may obtain advances from a third party lender for expenses incurred by the Receiver relating to the care, preservation and maintenance of the Receivership Estate; provided, however, that any third party advance (and all rights of the third party lender) shall be subordinate in all respects to the Lender's right to payment under the Contour Loan Documents and the Lender's interest in the Contour Collateral, unless the Lender agrees in writing to alternative treatment; and

xxxii.  generally do, execute, and perform any other act, deed, matter, or thing whatsoever that the Receiver reasonably believes ought to be done, executed, and performed in and about, or with respect to, the Receivership Estate; provided, however, that notwithstanding the Receiver's power and authority to undertake any of the foregoing, the Receiver shall have no obligation to do so if the Receiver believes, in its sole business judgment, such action would not be in the best interest of the Receivership Estate or if the Receiver lacks the resources in the Receivership Estate to fund such action after payment of other expenses of the Receivership deemed by the Receiver to be more critical.

H.     The Receiver shall have the power, in accordance with applicable law, to avoid fraudulent transfers or conveyances of any of the Contour Borrowers' assets or fraudulent obligations incurred by the Contour Borrowers prior to the appointment of the Receiver.

I.      The Receiver shall be bound by all applicable laws.

J.      Subject to Court approval and compliance with 28 U.S.C. §2001, the Receiver shall have the power to market for sale and sell all or any part of the Receivership Estate.

17

4898-2533-7162.3

**The Receiver Shall Have Exclusive Control Over the Receivership Estate Without Interference**

K.      The Receiver shall have full and sole control over all of the Receivership Estate, including all authorizations or other documentation necessary or desirable for the Receiver to administer, maintain, and operate the Receivership Estate in accordance with applicable law.

L.      The Contour Borrowers are hereby enjoined from administering, operating, directing, controlling or managing the business and affairs of the Receivership Estate, which authority has been vested solely and exclusively in the Receiver under this Order.

M.      Unless otherwise approved or directed by the Receiver, the Contour Borrowers and all persons, firms, corporations and associations in any way related to, linked to, or associated with the Contour Borrowers, along with their officers, directors, stockholders, members, managers, subscribers, agents and all other persons in active concert or participation with them, are prohibited and enjoined from: (i) the transaction of further business with the Receivership Estate; (ii) the waste, transfer, or disposition of property of the Receivership Estate; (iii) doing any action or thing whatsoever to interfere with the taking control, possession and administration by the Receiver of the Receivership Estate; (iv) interfering in any way with the exclusive jurisdiction of this Court over the Receivership Estate; (v) the institution or further prosecution of any action or proceedings against the Receiver, the Receivership Estate or its assets, except before the Court; (vi) the filing of any petition for relief against or on behalf of the Contour Borrowers pursuant to Title 11 of the United States Code; (vii) withholding from the Receiver books, accounts, documents, records or any other part of the Receivership Estate relating to the business of the Receivership Estate; and (viii) any other threatened or contemplated action that might lessen the value of the Receivership Estate, impede the Receiver's discharge of its duties, prejudice the rights of the Lender or other creditors, or interfere with any proceeding initiated by the Receiver.

18

4898-2533-7162.3

N.      The Contour Borrowers, along with their managers, agents, employees, officials, officers and successors and assigns, shall fully cooperate with the Receiver in all matters related to this Order and the operation and administration of the Receivership Estate, including but not limited to executing all documents, providing all authorizations, and taking any other action that the Receiver believes is necessary or desirable to facilitate the operation of the Receivership Estate or to exercise its powers as Receiver.

O.      The Receiver's full and sole control of the Receivership Estate shall not in any way diminish the duties and cooperation required by the Contour Borrowers, along with their agents, employees, officials, officers and successors and assigns, under this Order.

P.      Upon notice of this Order, any person or entity, bank, financial or depository institution, or any employee or agent of such person or entity, shall be deemed to be required to comply with all terms of this Order until this Court shall have relieved such person from the terms of this Order by subsequent order.  Any vendors or utility provides of the Contour Borrowers with notice of this Order are prohibited from terminating services due to pre-receivership liabilities absent further order of the Court.

Q.      All civil legal proceedings of any nature related to any Receivership Property are stayed in their entirety until further Order of this Court.

**The Receiver's Rights and Obligations**

R.      The Receiver (including Margolis) and any other Professional or Service Provider engaged by the Receiver (collectively, the "*Receiver Affiliates*") shall owe duties only to the Receivership Estate and the Court, but not to the Lender, the Contour Borrowers, or any other third party.  The Receiver's retention of the law firm of _____ to assist and represent the Receiver is hereby approved.  The Receiver is, without further approval of

the Court, authorized to engage a qualified property management company or companies to manage the Facilities should it determine that it is in the best interests of the Receivership Estate to replace the current management company.

S.    The Receiver shall make an accounting and keep accurate records concerning the Receivership Estate, including the actual revenues collected, any protective advances made by the Lender to the Receivership Estate, and expenses paid each month, and make such records available to the Lender, the Contour Borrowers and the Court during normal business hours and upon reasonable notice.

T.    The Receiver shall prepare an annual operating budget after reviewing the Contour Borrowers' operations, which budget shall include projected revenues, operating expenses and ongoing reasonable and necessary professional fees and expenses (including fees of the Receiver and any Receiver Affiliates) and shall be subject to approval by Lender.  The Receiver shall update said budget from time-to-time as needed and shall not materially exceed the budget without the prior written approval Lender.  In the event Lender declines to approve any budget, expense or indebtedness that the Receiver believes is in the best interests of the Receivership Estate, the Receiver may petition the Court for approval to pay or incur same.

U.    The Receiver shall permit the Lender and its respective agents and independent contractors, to inspect the Receivership Estate and the Receiver's records with respect to the Receivership Estate during normal business hours and upon reasonable notice.

V.    The Receiver shall review whether the Receivership Estate is in compliance with the requirements established with respect to the Contour Loans, as set forth in the Contour Loan Documents, and to the extent feasible shall make reasonable efforts to regain or maintain compliance with such requirements.

4898-2533-7162.3

W.    The Receiver shall have the absolute right, but not the duty, to change any accounts or other investment funds in which the Cash Equivalent Assets are currently maintained to any other account or fund if such change is in compliance with the terms of the Contour Loan Documents and this Order.

X.    The Receiver and Receiver Affiliates  shall not have personal liability for any liabilities of the Receivership Estate or obligations incurred pursuant to the terms of this Order or any other order of this Court and, in the event any such liability or obligation is at any time asserted against the Receiver Affiliates, the Receiver may use revenues derived from the Receivership Estate to contest any such claimed liability and to pay, compromise, settle or discharge such claimed liability on terms reasonably satisfactory to the Receiver, and such expenses shall constitute operating expenses of the Receivership Estate.

Y.    The Receiver and Receiver Affiliates shall perform the duties and obligations imposed on them by this Order with reasonable diligence and care under the circumstances and neither the Receiver nor any of the Receiver Affiliates shall be personally liable to the Lender, the Contour Borrowers or any third party except for such of their own acts as shall constitute fraudulent or willful misconduct as determined by a Final Order.  For purposes of this Order, "Final Order" shall mean an order or judgment of this Court as to which: (a) the time to appeal, petition for certiorari, or file a motion for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for re- argument or rehearing shall then be pending; or (b) in the event that an appeal, writ for certiorari, re-argument or rehearing has been sought, the time to take any further appeal, petition for certiorari, or request for re-argument or rehearing shall have expired; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure may be filed

21

4898-2533-7162.3

with respect to such order, as long as such a motion has not actually been filed.

Z.    The Receiver and Receiver Affiliates shall be defended, held harmless, and indemnified from time to time by the Receivership Estate against any and all losses, claims, costs, expenses and liabilities (including legal fees, costs and expenses), and any costs of defending any action, suit, proceeding or investigation to which the Receiver or Receiver Affiliates may be subject, by reason of their execution in good faith of their duties under this Order or any other order of this Court; provided, however, such indemnity shall be payable solely from the Receivership Estate.

AA.    At a reasonable expense to the Receivership Estate, the Receiver may obtain insurance, or be added to existing insurance policies, against claims for liability, damages awards and settlements, for the benefit of the Receiver, the Receiver Affiliates and the Receivership Estate.

BB.    Any actions or proceedings which involve the Receiver, any Receiver Affiliate, or the Receivership Estate or relating in any way to the Receivership Estate or the administration, operation or control of the Receivership Estate by the Receiver shall be filed in this Court, and no judgment of any party other than the Lender shall be enforced against the Receivership Estate absent further order of this Court.

CC.    As an appointee of this Court, the Receiver and Receiver Affiliates shall be entitled to judicial immunity as provided under applicable law.

DD.    The Receivership Estate shall be subject to and liable for only such local, state, and federal taxes that accrue during the pendency of the Receivership and for which the Receivership Estate would have become liable when operated by the Contour Borrowers.

EE.    Notwithstanding anything in this Order to the contrary, nothing contained in this

22

4898-2533-7162.3

Order shall be deemed to be either an assumption of liability by the Receiver or the Lender, or a requirement that the Receiver or the Lender fund the costs of this receivership or the operating expenses of the Facilities, which costs and expenses shall be paid exclusively from the revenues derived from the Facilities and the Contour Collateral and the assets comprising the Facilities and the Contour Collateral, which revenues and assets, including accounts and deposit accounts of the Contour Borrowers or proceeds from the sale of the Contour Collateral, are vested in the Receiver pursuant to this Order.

**Payment of Fees and Costs**

FF.      The Receiver shall file applications for payment of the Receiver's and Receiver Affiliates fees and expenses on the twentieth (20th) day of each calendar month.  Unless a party files a written objection to the application for payment within fourteen (14) calendar days of the filing of the application for payment, the application shall be deemed approved on an interim basis and the Receiver is authorized to pay the fees and expenses of the Receiver and the Receiver Affiliates as necessary expenses of operation of the Facilities without further order of the Court, subject to the Court's final approval upon the Receiver's final accounting and the Court's discharge of the Receiver.

GG.      For its services under this Order, not including any fees or expenses of any Receiver Affiliates (which shall be paid as operating expenses of the Receivership Estate as provided herein), the Receiver shall receive a monthly fee equal to one percent (1%) of the monthly gross revenue from the Facilities, plus the Receiver's actual, reasonable and necessary out-of-pocket expenses directly related to the performance of the Receiver's duties under this Order, including, but not limited to, local housing, meals, travel, local transportation, and

23

4898-2533-7162.3

transportation to and from (i) the Facilities and/or the Court and (ii) the Receiver's primary office or residence.

HH.    Fees and expenses payable to the Receiver and Receiver Affiliates under this Order shall be treated as priority administrative claims against the Receivership Estate, and payment of such amounts in accordance with this order shall take priority over payment of any claims arising prior to the date on which the Receiver is appointed (including, but not limited to, claims of the Lender with respect to the Loans).

### Administrative Matters

II.    The Receiver may only be removed by order of this Court upon appropriate motion, notice, and hearing, after a showing of good cause by the Lender or the Contour Borrowers.

JJ.    Within 14 days of the Receiver's acceptance of appointment, the Contour Borrowers and, to the extent the information is in the possession of a management company (the "*Manager*"), Manager shall provide the Receiver with a sworn statement listing: (a) the identity, location and estimated value of all property, books, records, contracts and other assets related to and/or appurtenant to the Facilities; (b) the names, identities, and contact information (telephone, mailing address, and email address) of all management companies, managers, employees, contractors, subcontractors, accountants, attorneys, other personnel, and any other agents providing goods or services to or in connection with the Facilities; (c) a complete inventory of the Facilities' assets and liabilities, including any ongoing litigation related to the Facilities or their operations; and (d) copies of all Contracts and Licenses, agreements, leases, and service agreements related to the Facilities.

KK.    Starting thirty (30) days after entry of this Order, and within twenty (20) days after

24

the end of each calendar month thereafter, the Receiver shall file with this Court monthly reports concerning the financial results of the operation of the Receivership Estate.

LL.    The Receiver may seek direction from this Court on any matter related to this Order, including, but not limited to, relief from or modification of the provisions of this Order.

MM.    The Receiver may seek such other and further orders of this Court as it deems necessary or expedient to carry out its duties and responsibilities under this Order.

NN.    The Receiver may resign and be discharged of its responsibilities at any time by giving thirty (30) days' prior written notice to this Court; provided, however, that the Receiver may petition this Court to approve such resignation and discharge upon shorter notice for good cause shown.

OO.    At the completion of its duties set forth in this Order, or at such earlier time as the Receiver has determined that the purposes of this Order may no longer be effectively fulfilled by the Receiver, the Receiver may file a motion seeking to terminate its responsibilities as Receiver and the Court supervision of the Receivership Estate.

PP.    Upon the satisfaction and discharge of all indebtedness and obligations secured under the Contour Loan Documents, the Court shall enter an Order, as appropriate, terminating the receivership.

QQ.    As needed until the Receiver is fully ready to begin exercising its authorities and powers as set forth above, the Contour Borrowers, and Manager shall avoid harm to the Receivership Estate and ensure the Receiver can carry out its responsibilities as required by this Order.

RR.    The Contour Borrowers, Manager and their successors, assigns, agents, employees, members, attorneys, or anyone acting for or in concert with them shall be prohibited from: (i)

25

4898-2533-7162.3

possessing or managing the Facilities (unless requested or approved by the Receiver) and from interfering in any way with the possession or management of the Facilities by the Receiver; (ii) collecting, withdrawing, transferring, conveying, concealing, or otherwise disposing of the Contour Collateral, including any revenues and profits derived therefrom, during and pending the appointment of the Receiver; (iii) removing any property from the Facilities and from removing, destroying, concealing, changing, or altering in any manner any of the books or records relating to the ownership, possession, or operating of the Facilities and other Contour Collateral.

SS.    Further, the Contour Borrowers are required to pay to the Receiver any rents, revenues and other cash collateral in their possession or control derived from the Facilities and other Contour Collateral, and are required to immediately pay and turn over to the Receiver and to perform all other acts necessary to transfer to the Receiver all funds on hand in cash and all funds held in deposit accounts for the benefit of the Facilities or arising from the ownership, possession, or operating of the Facilities and all accounts, accounts receivable, and any other collectibles, and all keys, books, records, equipment, and all things in any manner related to the ownership, possession, or operation of the Facilities.  For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the Lender shall continue to administer and control all funds and accounts established under the terms of the Contour Loan Documents.

TT.    Further, the Contour Borrowers and any other party with notice of this Court's order are prohibited from prosecuting any claim against the Receiver or the Contour Collateral, other than in this action and only after a proper motion is filed and an order entered allowing such party to file such a claim herein.

### Effect of Order and Jurisdiction

UU.    Except as expressly set forth in this Order, the terms and conditions of the Contour

26

4898-2533-7162.3

Loan Documents and any documents related to the Contour Loan Documents, including the rights, property, powers, authority and assets conferred in such documents, remain in full force and effect.

VV.    Except as expressly set forth in this Order, nothing in this Order shall act to divest in any way the Lender of any collateral, property or asset under the control of the Lender or enjoin or otherwise prohibit the Lender from pursuing any other remedies as provided in the Contour Loan Documents.  All of the Lender's claims and causes of action against the Contour Borrowers shall be preserved and shall not be deemed waived, compromised, released or prejudiced in any way by this receivership proceeding. This receivership proceeding shall not bar or preclude the Lender, under the doctrines of collateral estoppel, res judicata, or any other doctrine or preclusion, from asserting or maintaining any claims or causes of action against the Contour Borrowers, including, but not limited to, any claims or causes of action for recovery of amounts owed under the Contour Loan Documents or proceedings by foreclosure, either non-judicial or judicial, or otherwise to sell the Contour Collateral or any portion of the Contour Collateral.

WW.    Nothing in this Order shall relieve the Contour Borrowers or the Facilities of any obligation or liability under any existing judgment, order or decree.

XX.    Until the Receiver is discharged and this receivership is terminated, the Court retains jurisdiction over this matter to: (i) amend, supplement or delete any provision of this Order; (ii) enforce compliance with or to punish violations of this Order; and (iii) order any additional actions or remedies as may be appropriate or reasonably necessary.

YY.    The reversal or modification on appeal of this Order shall not affect the validity of any actions taken in good faith by the Receiver, the payment of compensation to which the Receiver or Receiver Affiliates are entitled, or the payment of expenses incurred by the Receiver

27

or Receiver Affiliates pursuant to this Order.

ZZ.    This Order shall be immediately effective upon its entry and shall continue until further order of this Court.

DONE and ORDERED the ___ day of _____, 2025.

_____
U.S. DISTRICT JUDGE

**APPROVED AND AGREED TO:**

COUNSEL FOR THE CONTOUR BORROWERS

_____
Charles Denaburg
Frank C. Galloway III
David Schoel
**The Woodcrest Group, LLC**
2200 Woodcrest Place, Suite 315
Birmingham, AL 35209
Phone: 205-807-9763
cld@woodcrestgroup.law
fcg3@woodcrestgroup.law
dds@woodcrestgroup.law

COUNSEL FOR THE WELLS FARGO BANK, N.A.

_____
N. Christian Glenos (ASB-0784-L48N)
Macy Walters (ASB-4358-E175)
**Bradley Arant Boult Cummings, LLP**
1819 Fifth Avenue North
Birmingham, AL 35203
Phone:  205-521-8000
cglenos@bradley.com
mwalters@bradley.com

28

4898-2533-7162.3