FILED
2025 Dec-16  AM 09:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **WELLS FARGO BANK, N.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO:** |
| | § | |
| **CONTOUR BUCKINGHAM AL LLC,** | § | |
| **CONTOUR CALLINGTON AL LLC, and** | § | |
| **CONTOUR CARLYLE AL LLC,** | § | |
| | § | |
| **Defendants.** | § | |

## AGREED ORDER APPOINTING RECEIVER

Pending before the Court is the *Motion for Appointment of Receiver* (the "***Receiver Motion***") filed by Plaintiff Wells Fargo Bank, N.A. After consideration of the Motion, Brief in Support of Motion for Appointment of Receiver, the Declaration of Jonathon S. Margolis, and the Stipulations for Appointment of Receiver signed by the Defendants, and upon finding that this Court has jurisdiction over the parties and matters raised in the Verified Complaint and Receiver Motion and that venue is proper in this Court; and after due consideration of the entire record in this matter, the Court hereby finds and concludes as follows:

### FINDINGS OF FACT & CONCLUSIONS OF LAW

1.      Wells Fargo Bank, N.A. ("***Lender***") is a national banking association having its principal place of business and main office in the State of South Dakota. For purposes of diversity jurisdiction, Lender is a citizen of the State of South Dakota. *Wachovia v. Schmidt*, 546 U.S. 303, 318 (2006) (for diversity jurisdiction, a national banking association is "located" in and is a "citizen" of the state in which its main office is located).

2.      Contour Buckingham AL LLC ("***Contour Buckingham***" or "***Buckingham***") is a limited liability company organized and existing under the laws of the state of Delaware.  No member of Buckingham is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

3.      Contour Callington AL LLC ("***Contour Callington***" or "***Callington***") is a limited liability company organized and existing under the laws of the state of Delaware.  No member of Callington is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

4.      Contour Carlyle AL LLC ("***Contour Carlyle***" or "***Carlyle***") is a limited liability company organized and existing under the laws of the state of Delaware.  No member of Carlyle is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

## A.  The Buckingham Loan

5.      Contour Buckingham is the owner of a residential apartment complex situated at 114 Aspen Circle, Homewood, Alabama, commonly known as "The Park at Buckingham" (the "***Buckingham Facility***").

6.      On or about September 30, 2022, Lender made a term loan to Buckingham in the original principal amount of $60,000,000.00 (the "***Buckingham Loan***").

7.      The Buckingham Loan is evidenced by, among other things, that certain Term Loan Note dated September 30, 2022, executed by Buckingham in favor of Lender, as amended by that certain First Amendment to Term Loan Note dated May 31, 2023 (collectively as amended, the "***Buckingham Note***").

8.      To induce Lender to make the Buckingham Loan, Buckingham executed a Security Agreement dated September 30, 2022 in favor of Lender, granting Lender a first-priority security interest in all personal property of Buckingham, including, but not limited to, all

2

accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, and deposit accounts described in the Security Agreement and Schedule 1 to the Security Agreement (collectively, the *"Buckingham Security Agreement"*).

9.     Lender perfected its security interest in the collateral described in the Buckingham Security Agreement through filing a UCC financing statement with the Delaware Department of State as U.C.C. Initial Filing No. 20228185712 (the *"Buckingham UCC-1"*).

10.     As further security for Buckingham's obligations to Lender in connection with the Buckingham Loan, Buckingham executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated September 30, 2022, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on October 6, 2022 as Instrument No. 2022104961 (the *"Buckingham Mortgage"*). The Buckingham Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Buckingham Facility, as more particularly described in Exhibit A to the Buckingham Mortgage.

11.     The Buckingham Note, the Buckingham Security Agreement, the Buckingham UCC-1, the Buckingham Mortgage, the Buckingham Forbearance Agreement (as hereinafter defined) and any and all other documents evidencing, describing, securing, or relating to the Buckingham Loan are herein referred to as the *"Buckingham Loan Documents."* The real and personal property collateral described in the Buckingham Loan Documents is collectively referred to herein as the *"Buckingham Collateral."*

12.     Pursuant to the terms of the Buckingham Loan Documents, the Buckingham Collateral secures all of Buckingham's obligations under the Buckingham Loan Documents.

### B. The Callington/Carlyle Loan

13.    Contour Callington is the owner of a residential apartment complex situated at 700 Aspen Drive, Birmingham, Alabama, commonly known as "The Park at Callington" (the *"Callington Facility"*).

14.    Contour Carlyle is the owner of a residential apartment complex situated at 200 Robert Jemison Drive, Birmingham, Alabama, commonly known as "The Park at Carlyle" (the *"Carlyle Facility"* and, collectively with the Buckingham Facility and the Callington Facility, the *"Facilities"*).

15.    On or about January 27, 2023, Lender made a term loan to Callington and Carlyle in the original principal amount of $85,000,000.00 (the *"Callington/Carlyle Loan"*).

16.    The Callington/Carlyle Loan is evidenced by, among other things, that certain Term Loan Note dated January 27, 2023 executed by Callington and Carlyle in favor of Lender, as amended by that certain First Amendment to Term Loan Note dated May 31, 2023, and as further amended by that certain Second Amendment to Term Loan Note dated August 22, 2023 (collectively as amended, the *"Callington/Carlyle Note"*).

17.    To induce Lender to make the Callington/Carlyle Loan, Callington and Carlyle executed a Security Agreement dated January 27, 2023 in favor of Lender, granting Lender a security interest in all of their respective personal property, including, but not limited to, all accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, and deposit accounts described in the Security Agreement and Schedule 1 to the Security Agreement (collectively, the *"Callington/Carlyle Security Agreement"*).

4

4898-2533-7162.3

18.    Lender perfected its security interest in the collateral described in the Callington/Carlyle Security Agreement through the filing of two (2) UCC financing statements with the Delaware Department of State: (1) U.C.C. Initial Filing No. 20230733096 (the *"Callington UCC-1"*); and (2) U.C.C. Initial Filing No. 20230733195 (the *"Carlyle UCC-1"*).

19.    As further security for Callington's obligations to Lender in connection with the Callington/Carlyle Loan, Callington executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated January 27, 2023, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on February 7, 2023 as Instrument No. 2023009940 (the *"Callington Mortgage"*). The Callington Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Callington Facility, as more particularly described in Exhibit A to the Callington Mortgage.

20.    As further security for Carlyle's obligations to Lender in connection with the Callington/Carlyle Loan, Carlyle executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated January 27, 2023, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on February 7, 2023 as Instrument No. 2023009941 (the *"Carlyle Mortgage"*). The Carlyle Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Carlyle Facility, as more particularly described in Exhibit A to the Carlyle Mortgage.

21.    The Callington/Carlyle Note, the Callington/Carlyle Security Agreement, the Callington UCC-1, the Carlyle UCC-1, the Callington Mortgage, the Carlyle Mortgage, the Callington/Carlyle Forbearance Agreement (as hereinafter defined) and any and all other documents evidencing, describing, securing, or relating to the Callington/Carlyle Loan are herein referred to as the *"Callington/Carlyle Loan Documents."* The real and personal property

5

collateral described in the Callington/Carlyle Loan Documents is collectively referred to herein as the *"Callington/Carlyle Collateral"*.

22.     Pursuant to the terms of the Callington/Carlyle Loan Documents, the Callington/Carlyle Collateral secures all of Callington and Carlyle's obligations under the Callington/Carlyle Loan Documents.

**C. The Contour Borrowers' Events of Default, Acceleration, and Forbearance**

23.     Buckingham, Callington, and Carlyle (collectively, the *"Contour Borrowers"*) have failed to pay and perform their respective obligations under the Buckingham Loan Documents and Callington/Carlyle Loan Documents.

24.     The following defaults occurred and remain outstanding under the Buckingham Loan Documents (collectively, the *"Buckingham Pre-Forbearance Defaults"*):

> a.     Buckingham failed to remit the May 10, 2024 and June 10, 2024 required payments of principal and interest due under the Buckingham Loan Documents; and

> b.     As of the March 31, 2024 test date, Buckingham failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 as required by the Buckingham Loan Documents.

25.     Likewise, Callington and Carlyle failed to remit the April 10, 2024, May 10, 2024, and June 10, 2024 scheduled payments of principal and interest due under the Callington/Carlyle Loan Documents (collectively, the *"Callington/Carlyle Pre-Forbearance Defaults"*).

26.     On June 10, 2024, Lender gave the Contour Borrowers written notice of the Buckingham Pre-Forbearance Defaults and the Callington/Carlyle Pre-Forbearance Defaults.

4898-2533-7162.3

27.     As a result of the Pre-Forbearance Defaults, Lender entered into Forbearance Agreements with the Contour Borrowers.

28.     Lender entered into a Forbearance Agreement with Buckingham dated June 25, 2024 (the *"Buckingham Forbearance Agreement"*), pursuant to which Lender accelerated the entire amount due under the Buckingham Loan Documents but agreed to forbear from exercising its rights and remedies on account of the Buckingham Pre-Forbearance Defaults until August 31, 2024.

29.     Under Section 2(a) of the Buckingham Forbearance Agreement, Buckingham agreed to pay the "May 10, 2024 and June 10, 2024 scheduled monthly payments" that were delinquent and "otherwise bring any amounts due or delinquent under the Note current" no later than June 28, 2024.

30.     Lender entered into a Forbearance Agreement with Callington and Carlyle on June 25, 2024 (the *"Callington/Carlyle Forbearance Agreement"*), pursuant to which Lender accelerated the entire amount due under the Callington/Carlyle Loan Documents but agreed to forbear from exercising its rights and remedies on account of the Callington/Carlyle Pre-Forbearance Defaults until August 31, 2024.

31.     Under Section 2(a) of the Callington/Carlyle Forbearance Agreement, Callington and Carlyle agreed to pay Lender "the April 10, 2024, May 10, 2024, and June 10, 2024 scheduled monthly payments" that were delinquent and "otherwise bring any amounts due or delinquent under the Note current" no later than June 28, 2024.

7

**D. The Contour Borrowers' Forbearance Defaults**

32.    The Contour Borrowers failed to pay and perform their respective obligations to Lender under the Buckingham Forbearance Agreement and the Callington/Carlyle Forbearance Agreement.

33.    The Contour Borrowers also committed new defaults under the Buckingham Loan Documents and the Callington/Carlyle Loan Documents after entering into forbearance agreements with Lender.

34.    Buckingham failed to pay and perform its respective obligations under the Buckingham Forbearance Agreement, and added additional defaults under the Buckingham Loan Documents, including, without limitation, the following (collectively, the *"Buckingham Forbearance Defaults"*):

      a.   Contour Buckingham failed to remit required payments of principal and interest due under the Buckingham Loan Documents;

      b.   Contour Buckingham failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 for the March 31, 2024, June 30, 2024, September 30, 2024, and December 31, 2024 calendar quarters; and

      c.   Contour Buckingham failed to pay the 2023 and 2024 real property taxes assessed against the Buckingham Mortgage Property.

35.    Similarly, Callington and Carlyle failed to pay and perform their respective obligations under the Callington/Carlyle Forbearance Agreement and added multiple defaults under the Callington/Carlyle Loan Documents, including, without limitation, the following (collectively, the *"Callington/Carlyle Forbearance Defaults"*):

8

a. Callington and Carlyle failed to remit required payments of principal and interest due under the Callington/Carlyle Loan Documents;

b. Callington and Carlyle failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 for the June 30, 2024, September 30, 2024, and December 31, 2024 calendar quarters; and

c. Callington and Carlyle failed to pay the 2023 and 2024 real property taxes assessed against the Callington and Carlyle Mortgaged Properties.

36. On February 10, 2025, Lender gave the Contour Borrowers written notice of their Forbearance Defaults under both the Buckingham Loan and the Callington/Carlyle Loan. Lender declared the entire amounts outstanding on both loans to be immediately due and payable and demanded payment in full of the Loans from the Contour Borrowers.

37. On June 18, 2025, Lender and the Contour Borrowers entered into a Second Forbearance Agreement, pursuant to which Lender granted the Contour Borrowers until the earlier of August 31, 2025 or the occurrence of any new defaults by the Contour Borrowers to repay the Loans in full. In consideration for Lender's commitment to forbear, the Contour Borrowers agreed to the appointment of a receiver over the Contour Collateral (as defined hereinafter) in the event new defaults occurred and/or they otherwise failed to pay in full their indebtedness to Lender under the Loan Documents within the time period prescribed in the Second Forbearance Agreement.

38. The Contour Borrowers have breached the Second Forbearance Agreement and remain in default under both the Buckingham Loan Documents and Callington/Carlyle Loan Documents (collectively *"the Contour Loans"*). As a result, all amounts owing under the Contour Loans are immediately due and payable to Lender.

9

4898-2533-7162.3

39.    The Contour Loans are secured by the Buckingham Collateral and the Callington/Carlyle Collateral (collectively, the "*Contour Collateral*").

## B.    Appointment of Receiver

40.    Lender is entitled to the appointment of a receiver under the express terms of the Buckingham Loan Documents and the Callington/Carlyle Loan Documents (collectively, the "*Contour Loan Documents*").    Specifically, Sections 5.2 of Buckingham Mortgage, the Callington Mortgage, and the Carlyle Mortgage provide:

> Upon the occurrence of any Default, and at any time thereafter, [Lender] shall have all of the following rights and remedies: … (d) To apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Subject Property as a matter of strict right and without regard to: (i) the adequacy of the security for the repayment of the Secured Obligations; (ii) the existence of a declaration that the Secured Obligations are immediately due and payable; or (iii) the filing of a notice of default; and Mortgager consents to such appointment.

41.    The Contour Loan Documents are legal, enforceable, and binding contracts, and the Contour Borrowers are each in default of their contractual and legal obligations owing under the Contour Loan Documents.

42.    Additionally, the Contour Borrowers have filed Stipulations for the Appointment of Receiver in this action consenting to the relief requested in the Receiver Motion.

43.    The appointment of a receiver is appropriate where, as here, parties have contractually agreed to a receivership, particularly when, as in this instance, the receiver provisions are clear and unambiguous, and the contracting parties are sophisticated.

44.    Unless a receiver is appointed, Lender will suffer irreparable harm.  Additionally, no adequate legal remedy exists under the circumstances.

45.    Lender and all stakeholders in the Facilities, including the residents, will benefit

4898-2533-7162.3

from the appointment of a receiver experienced in operating, stabilizing and restructuring distressed multi-family properties, under the oversight of this Court. Not only will this help preserve the value of the Contour Collateral and improve the marketability of the Facilities as a going concern, but the appointment of a receiver will provide a continuity of service to the residents through any transition period.

46.    Lender has proven its entitlement to the appointment of a receiver to ensure the economic and efficient operation of the Facilities given that: (a) Lender has a clear contractual right to be protected by the appointment of a receiver; (b) there exists imminent danger that the Facilities or other Contour Collateral will cease operations or diminish in value; (c) legal remedies are inadequate to satisfy Lender's claims; (d) no less drastic equitable remedy exists; and (e) the benefits of the appointment of a receiver outweigh any potential harm flowing therefrom.

47.    Farbman Group ("*Receiver*") is qualified to serve as receiver in this matter and has the requisite experience and qualifications to serve as receiver of the Facilities and other Contour Collateral pursuant to the terms of this Order.

48.    Jonathon S. Margolis, Senior Vice President of Asset Management at Farbman Group ("*Margolis*"), is similarly qualified and will be responsible in directing the Receiver's duties under this Order.

## ORDER

Based upon the foregoing findings and conclusions, the Receiver Motion is GRANTED. Accordingly, it is ORDERED that:

A.    Farbman Group is appointed as the Receiver over the Receivership Estate (as defined below).

11

4898-2533-7162.3

B.      The Receiver shall provide this Court with its written acceptance to faithfully perform the Receiver's duties as set forth in this Order, and shall file with the Clerk of the Court a surety bond in the amount of $25,000 to be provided by a corporate surety, guaranteeing performance of the Receiver's duties and obligations, the bond to be payable to this Court for loss due to the acts of all agents, servants, or employees of the Receiver.

### The Receivership Estate

C.      Upon entry of this Order and the Receiver's acceptance of its appointment as receiver of the Receivership Estate (as defined below) and posting of the required bond, the Receiver is directed and empowered to take from the Contour Borrowers all rights and powers of the Contour Borrowers with respect to the Facilities, and their administration and operation, including:

   i.     the Contour Collateral (as defined hereinabove);

   ii.    any and all real or personal property used in or related to the maintenance and operation of the Facilities, including but not limited to all equipment, fixtures, machinery, motor vehicles, automobiles, trucks, other rolling stock, leasehold improvements, tax identification and employer numbers, construction work in progress, supplies, raw materials, inventory, goods, work in process, parts, computers, computer software (including all licenses, leases, documentation, and source codes with respect to the computer software), telecommunication systems, fixtures, furniture, furnishings, office equipment, all tangible property furnished by or used in connection with the Facilities, as well as all rights, easements, and franchises appurtenant thereto (collectively, the "***Physical Assets***");

   iii.   any and all cash, cash equivalents, rents, bank accounts, deposit accounts, credits, prepaid expenses, deposits, deferred charges, advance payments, security deposits, prepaid items, funds, securities, investment accounts, accounts receivable, notes, notes receivable, mortgages, security interests, income, revenues derived from the Facilities, insurance claims, insurance proceeds, any and all civil claims, whether actual, contingent, or otherwise, and any and all other rights to receive payments and/or property used in, generated from, or related to the administration, maintenance, and operation of the Facilities as well as all rights, interests, licenses, and franchises related thereto (collectively, the "***Cash Equivalent Assets***");

12

4898-2533-7162.3

iv.    any and all records, documents, rent rolls, accounting records, contracts, leases, and operating data and/or electronically stored information (including any and all computer operating systems in which such information is or may be stored) relating to the operation and management of the Facilities and the Contour Collateral that is in the possession, custody, or control of the Contour Borrowers (collectively, the "***Books and Records***");

v.     any and all leases, contracts, licenses, agreements and permits affecting, or related to, the Facilities or their operation (collectively, the "***Contracts and Licenses***"); and

vi.    any and all of the internet domain names, post office box numbers, telephone and facsimile numbers, and any and all other listings and numbers used by the Contour Borrowers in connection with the operation and management of the Facilities (collectively, the "***Contact Information Assets***"; and together with the Contour Collateral, Physical Assets, Cash Equivalent Assets, Books and Records, and Contracts and Licenses, the "***Receivership Estate***").

D.     The Contour Borrowers and their successors, assigns, agents, officers, directors, stockholders, members, managers, employees, attorneys, accountants, anyone acting for or in concert with the Contour Borrowers, and any persons or entities, including banks, financial or depository institutions, receiving notice of this Order and having possession or control of the Contour Collateral, Books and Records, Cash Equivalent Assets, Contracts, Licenses, Contact Information Assets, the Facilities, and/or any and all Physical Assets are hereby ordered to immediately deliver over to the Receiver: (1) full access to all Books and Records; (2) full and exclusive control over any and all Cash Equivalent Assets (including any information required by a bank or financial or depository institution to enable the Receiver to take exclusive control over any and all Cash Equivalent Assets, e.g. access to online banking), Contracts and Licenses, and Contact Information Assets; and (3) full access to and exclusive control over any and all Physical Assets and the Contour Collateral.

**The Receiver's Authority and Power**

E.     Upon the acceptance by the Receiver of its appointment pursuant to this Order, and

13

4898-2533-7162.3

the posting of the required bond, the Receiver is granted the full power and authority to control, manage, administer, operate, and protect the Receivership Estate, and is hereby specifically vested with all statutory and common law powers, rights, and privileges of a receiver necessary to accomplish the purpose of this receivership.

F.    The Receiver is to operate and administer the Receivership Estate in an economical and efficient manner in compliance with the terms and conditions of the Contour Loan Documents (to the extent reasonably feasible) and applicable law.  The Receiver is hereby authorized and directed to recover, collect, operate, maintain, preserve, and manage the Receivership Estate in the best interests of the Receivership Estate's creditors, and to take all action deemed reasonable and necessary to ensure compliance with all applicable requirements imposed by local, state, or federal law.

G.    To that end, by this Order, the Court intends to give, and does hereby give, the Receiver the full power and authority to fulfill its obligations as Receiver of the Receivership Estate, including, but not limited to, the sole and exclusive right and authority to:

i.      take complete and exclusive possession, control, and custody of and to exclusively run, operate, administer, manage, and perform all acts necessary to operate the Receivership Estate in the ordinary course of business, in accordance with the provisions of the Contour Loan Documents and applicable local, state and federal law, including but not limited to entering into, modifying, and administering contracts and agreements for the provision of accommodations and related services to current and prospective residents of the Facilities;

ii.     take possession of all inventory, equipment, and improvements constituting the Facilities, and all books, records, and personal property relating to the Facilities, wherever located;

iii.    take possession of all bank accounts containing funds associated with the Facilities, wherever located, and to open, transfer, and change all bank and trade accounts relating to the Facilities and the Contour Collateral, including accounts to which residents of the Facilities or other third-party payors make payment so that all such accounts are in the name of the Receiver;

iv.     conduct an inventory of all personal property included in the Facilities;

v.      exercise all rights as to ownership of the Facilities subject to the limitations set forth herein;

14

4898-2533-7162.3

vi.     implement operational efficiencies and revenue enhancement programs;

vii.    fix, charge, revise, raise, and maintain rates and charges for services furnished by the Receivership Estate;

viii.   collect rents and revenues derived from the Receivership Estate and apply those rents and revenues to the expenses of operating and maintaining the Receivership Estate in such order and amount as the Receiver, in its business judgment, deems prudent and appropriate, with available resources then applied in such order as required under the Contour Loan Documents;

ix.     make any reasonable reductions or revisions in the Receivership Estate's operating expenses, whether or not in the ordinary course of business;

x.     manage, operate, maintain, and otherwise control all of the Contour Collateral as necessary to prevent diminution of the Contour Collateral's value including, but not limited to: (a) the receipt, collection, possession, and preservation of all accounts, incomes, profits, rents, and revenues; (b) subject to available resources in the Receivership Estate, from the date of this Order, the payment of taxes, insurance, utility charges, and other expenses and costs incurred in managing and preserving the Facilities and the Contour Collateral, including any past due amounts necessary to restore services, coverage or good standing; (c) if determined appropriate, the right to inspect or receive documents necessary for determining, investigating, reporting tax obligations and filing tax returns (provided, however, that the Receiver shall not be obligated or required by this Order to file tax returns on behalf of the Contour Borrowers); and (f) exercising any intangible rights;

xi.    receive, collect, take possession of, and preserve all accounts, incomes, profits, and other revenues generated from and by the Receivership Estate, subject to the requirements of the Contour Loan Documents;

xii.   terminate or modify any currently existing written or oral contract (other than the Contour Loan Documents or tenant leases), with any and all damages arising therefrom to be paid with revenues derived from the Receivership Estate in such amounts and at such times as the Receiver deems prudent in its business judgment;

xiii.  assume and assign any currently existing leases and/or written or oral contracts in accordance with the terms of this Order;

xiv.  enter into new contracts on behalf of the Receivership Estate for goods or services that the Receiver, in its business judgment, deems necessary or advisable for the operation of the Receivership Estate;

xv.   file, investigate, institute, prosecute, defend, compromise, adjust, or intervene in any action or proceeding, legal, equitable, or otherwise, before this Court or any other court, agency, or tribunal, as the Receiver may deem, in its sole business judgment, to be necessary and proper for the protection, maintenance, enhancement, and/or preservation of the Receivership Estate, or to further the provisions of this Order;

xvi.  investigate and determine the nature and extent of any and all prior expenditures that may have been improperly classified and take all reasonable and necessary action to have such expenses properly classified;

15

xvii.    investigate and determine whether all revenues have been properly accounted for and to take all reasonable and necessary action to recover any and all revenues that have been diverted away from the Receivership Estate or otherwise improperly applied and/or handled;

xviii.   institute, prosecute, defend, and settle such legal proceedings as the Receiver deems necessary relating to the recovery, collection, maintenance, protection, or proper care of the Receivership Estate, and to employ counsel therefore;

xix.     hire, discharge, manage, and control such employees and/or staff at the Facilities, except as prohibited by law, as the Receiver determines necessary or advisable;

xx.      permit the Lender and its respective agents and independent contractors and/or professionals to inspect fully the Facilities, their accounts, and all books and records, including records as to the maintenance of any portion of the Facilities, upon reasonable notice to the Receiver;

xxi.     take all such actions and expend all such sums as may be necessary and prudent in the Receiver's business judgment to obtain, maintain in effect, restore, or transfer all Licenses, insurance, zoning approvals and other approvals in an effort to ensure that the Receivership Estate may continue to be used for its intended purpose;

xxii.    enter into and/or terminate, modify, assume, and renew contracts for any insurance with the same or different insurance providers that the Receiver believes, in its sole business judgment, is necessary or advisable for the continued operation of the Receivership Estate in the ordinary course of business as a going concern;

xxiii.   terminate or modify, as the Receiver deems prudent in the exercise of its business judgment, any business activities of, or services provided at or in connection with, the Receivership Estate;

xxiv.    engage professionals in the ordinary course of the Facilities' business, including, but not limited to, attorneys, accountants, communication consultants, investment bankers, consultants, brokers, forensic and investigative accountants, engineers, managers and any other service providers (each a *"Professional"* or *"Service Provider"* as applicable) as the Receiver may, subject to the approval of the Lender, deem necessary or advisable to assist the Receiver in the performance of its duties under this Order and agree to such terms (including financial terms) with respect to such engagements as the Receiver may deem necessary or advisable, without further order of this Court and with the reasonable fees and expenses of such Professionals and Service Providers to be payable on a current basis from the Receivership Estate as operating expenses, subject to the provisions of Section FF below;

xxv.     comply with all requirements of all governmental authorities;

xxvi.    change any and all locks on the Receivership Estate;

xxvii.   generally, do, execute, and perform any other act, deed, matter, or thing whatsoever that the Receiver reasonably believes ought to be done, executed, and performed in and about, or with respect to, the Receivership Estate;

xxviii.  take all actions necessary and appropriate to preserve, maintain, renew, and protect all leases, contracts and licenses affecting, or related to, the Facilities or their operation to the extent the Receiver in its sole discretion determines that the said leases, contracts and licenses should be preserved, maintained, renewed, and

4898-2533-7162.3

protected, including making all necessary filings with the regulatory bodies and agencies with jurisdiction over the Facilities;

xxix. execute such documents as are necessary to transfer all leases, contracts and licenses affecting, or related to, the Facilities or their operation to any purchaser of the Facilities, including a purchaser at a non-judicial foreclosure sale which may be conducted by the Lender;

xxx. pay itself and any Professionals and/or Service Providers such fees (and reimburse such expenses) as are payable in accordance with the terms of this Order, absent contrary order of this Court;

xxxi. request and receive advances from the Lender on terms mutually agreeable to the Lender and the Receiver for expenses incurred by the Receiver relating to the care, preservation and maintenance of the Receivership Estate. All advances made by the Lender to the Receiver shall be deemed advances under and pursuant to the Contour Loan Documents to protect and preserve the Lender's interest in the Contour Collateral, shall be secured by all of the Contour Collateral, and shall have administrative claim priority against the Receivership Estate ahead of claims arising prior to the Receiver's appointment. Alternatively, the Receiver may obtain advances from a third party lender for expenses incurred by the Receiver relating to the care, preservation and maintenance of the Receivership Estate; provided, however, that any third party advance (and all rights of the third party lender) shall be subordinate in all respects to the Lender's right to payment under the Contour Loan Documents and the Lender's interest in the Contour Collateral, unless the Lender agrees in writing to alternative treatment; and

xxxii. generally do, execute, and perform any other act, deed, matter, or thing whatsoever that the Receiver reasonably believes ought to be done, executed, and performed in and about, or with respect to, the Receivership Estate; provided, however, that notwithstanding the Receiver's power and authority to undertake any of the foregoing, the Receiver shall have no obligation to do so if the Receiver believes, in its sole business judgment, such action would not be in the best interest of the Receivership Estate or if the Receiver lacks the resources in the Receivership Estate to fund such action after payment of other expenses of the Receivership deemed by the Receiver to be more critical.

H. The Receiver shall have the power, in accordance with applicable law, to avoid fraudulent transfers or conveyances of any of the Contour Borrowers' assets or fraudulent obligations incurred by the Contour Borrowers prior to the appointment of the Receiver.

I. The Receiver shall be bound by all applicable laws.

J. Subject to Court approval and compliance with 28 U.S.C. §2001, the Receiver shall have the power to market for sale and sell all or any part of the Receivership Estate.

4898-2533-7162.3

## The Receiver Shall Have Exclusive Control Over the Receivership Estate
## Without Interference

K. The Receiver shall have full and sole control over all of the Receivership Estate, including all authorizations or other documentation necessary or desirable for the Receiver to administer, maintain, and operate the Receivership Estate in accordance with applicable law.

L. The Contour Borrowers are hereby enjoined from administering, operating, directing, controlling or managing the business and affairs of the Receivership Estate, which authority has been vested solely and exclusively in the Receiver under this Order.

M. Unless otherwise approved or directed by the Receiver, the Contour Borrowers and all persons, firms, corporations and associations in any way related to, linked to, or associated with the Contour Borrowers, along with their officers, directors, stockholders, members, managers, subscribers, agents and all other persons in active concert or participation with them, are prohibited and enjoined from: (i) the transaction of further business with the Receivership Estate; (ii) the waste, transfer, or disposition of property of the Receivership Estate; (iii) doing any action or thing whatsoever to interfere with the taking control, possession and administration by the Receiver of the Receivership Estate; (iv) interfering in any way with the exclusive jurisdiction of this Court over the Receivership Estate; (v) the institution or further prosecution of any action or proceedings against the Receiver, the Receivership Estate or its assets, except before the Court; (vi) the filing of any petition for relief against or on behalf of the Contour Borrowers pursuant to Title 11 of the United States Code; (vii) withholding from the Receiver books, accounts, documents, records or any other part of the Receivership Estate relating to the business of the Receivership Estate; and (viii) any other threatened or contemplated action that might lessen the value of the Receivership Estate, impede the Receiver's discharge of its duties, prejudice the rights of the Lender or other creditors, or interfere with any proceeding initiated by the Receiver.

18

N.     The Contour Borrowers, along with their managers, agents, employees, officials, officers and successors and assigns, shall fully cooperate with the Receiver in all matters related to this Order and the operation and administration of the Receivership Estate, including but not limited to executing all documents, providing all authorizations, and taking any other action that the Receiver believes is necessary or desirable to facilitate the operation of the Receivership Estate or to exercise its powers as Receiver.

O.     The Receiver's full and sole control of the Receivership Estate shall not in any way diminish the duties and cooperation required by the Contour Borrowers, along with their agents, employees, officials, officers and successors and assigns, under this Order.

P.     Upon notice of this Order, any person or entity, bank, financial or depository institution, or any employee or agent of such person or entity, shall be deemed to be required to comply with all terms of this Order until this Court shall have relieved such person from the terms of this Order by subsequent order.  Any vendors or utility provides of the Contour Borrowers with notice of this Order are prohibited from terminating services due to pre-receivership liabilities absent further order of the Court.

Q.     All civil legal proceedings of any nature related to any Receivership Property are stayed in their entirety until further Order of this Court.

### The Receiver's Rights and Obligations

R.     The Receiver (including Margolis) and any other Professional or Service Provider engaged by the Receiver (collectively, the "*Receiver Affiliates*") shall owe duties only to the Receivership Estate and the Court, but not to the Lender, the Contour Borrowers, or any other third party.  The Receiver's retention of the law firm of *Epstein Becker Green* to assist and represent the Receiver is hereby approved.  The Receiver is, without further approval of the

19

Court, authorized to engage a qualified property management company or companies to manage the Facilities should it determine that it is in the best interests of the Receivership Estate to replace the current management company.

S.    The Receiver shall make an accounting and keep accurate records concerning the Receivership Estate, including the actual revenues collected, any protective advances made by the Lender to the Receivership Estate, and expenses paid each month, and make such records available to the Lender, the Contour Borrowers and the Court during normal business hours and upon reasonable notice.

T.    The Receiver shall prepare an annual operating budget after reviewing the Contour Borrowers' operations, which budget shall include projected revenues, operating expenses and ongoing reasonable and necessary professional fees and expenses (including fees of the Receiver and any Receiver Affiliates) and shall be subject to approval by Lender.  The Receiver shall update said budget from time-to-time as needed and shall not materially exceed the budget without the prior written approval Lender.  In the event Lender declines to approve any budget, expense or indebtedness that the Receiver believes is in the best interests of the Receivership Estate, the Receiver may petition the Court for approval to pay or incur same.

U.    The Receiver shall permit the Lender and its respective agents and independent contractors, to inspect the Receivership Estate and the Receiver's records with respect to the Receivership Estate during normal business hours and upon reasonable notice.

V.    The Receiver shall review whether the Receivership Estate is in compliance with the requirements established with respect to the Contour Loans, as set forth in the Contour Loan Documents, and to the extent feasible shall make reasonable efforts to regain or maintain compliance with such requirements.

20

4898-2533-7162.3

W.    The Receiver shall have the absolute right, but not the duty, to change any accounts or other investment funds in which the Cash Equivalent Assets are currently maintained to any other account or fund if such change is in compliance with the terms of the Contour Loan Documents and this Order.

X.    The Receiver and Receiver Affiliates  shall not have personal liability for any liabilities of the Receivership Estate or obligations incurred pursuant to the terms of this Order or any other order of this Court and, in the event any such liability or obligation is at any time asserted against the Receiver Affiliates, the Receiver may use revenues derived from the Receivership Estate to contest any such claimed liability and to pay, compromise, settle or discharge such claimed liability on terms reasonably satisfactory to the Receiver, and such expenses shall constitute operating expenses of the Receivership Estate.

Y.    The Receiver and Receiver Affiliates shall perform the duties and obligations imposed on them by this Order with reasonable diligence and care under the circumstances and neither the Receiver nor any of the Receiver Affiliates shall be personally liable to the Lender, the Contour Borrowers or any third party except for such of their own acts as shall constitute fraudulent or willful misconduct as determined by a Final Order.  For purposes of this Order, "Final Order" shall mean an order or judgment of this Court as to which: (a) the time to appeal, petition for certiorari, or file a motion for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for re- argument or rehearing shall then be pending; or (b) in the event that an appeal, writ for certiorari, re-argument or rehearing has been sought, the time to take any further appeal, petition for certiorari, or request for re-argument or rehearing shall have expired; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure may be filed

21

with respect to such order, as long as such a motion has not actually been filed.

Z.    The Receiver and Receiver Affiliates shall be defended, held harmless, and indemnified from time to time by the Receivership Estate against any and all losses, claims, costs, expenses and liabilities (including legal fees, costs and expenses), and any costs of defending any action, suit, proceeding or investigation to which the Receiver or Receiver Affiliates may be subject, by reason of their execution in good faith of their duties under this Order or any other order of this Court; provided, however, such indemnity shall be payable solely from the Receivership Estate.

AA.    At a reasonable expense to the Receivership Estate, the Receiver may obtain insurance, or be added to existing insurance policies, against claims for liability, damages awards and settlements, for the benefit of the Receiver, the Receiver Affiliates and the Receivership Estate.

BB.    Any actions or proceedings which involve the Receiver, any Receiver Affiliate, or the Receivership Estate or relating in any way to the Receivership Estate or the administration, operation or control of the Receivership Estate by the Receiver shall be filed in this Court, and no judgment of any party other than the Lender shall be enforced against the Receivership Estate absent further order of this Court.

CC.    As an appointee of this Court, the Receiver and Receiver Affiliates shall be entitled to judicial immunity as provided under applicable law.

DD.    The Receivership Estate shall be subject to and liable for only such local, state, and federal taxes that accrue during the pendency of the Receivership and for which the Receivership Estate would have become liable when operated by the Contour Borrowers.

EE.    Notwithstanding anything in this Order to the contrary, nothing contained in this

Order shall be deemed to be either an assumption of liability by the Receiver or the Lender, or a requirement that the Receiver or the Lender fund the costs of this receivership or the operating expenses of the Facilities, which costs and expenses shall be paid exclusively from the revenues derived from the Facilities and the Contour Collateral and the assets comprising the Facilities and the Contour Collateral, which revenues and assets, including accounts and deposit accounts of the Contour Borrowers or proceeds from the sale of the Contour Collateral, are vested in the Receiver pursuant to this Order.

## Payment of Fees and Costs

FF.    The Receiver shall file applications for payment of the Receiver's and Receiver Affiliates fees and expenses on the twentieth (20th) day of each calendar month.  Unless a party files a written objection to the application for payment within fourteen (14) calendar days of the filing of the application for payment, the application shall be deemed approved on an interim basis and the Receiver is authorized to pay the fees and expenses of the Receiver and the Receiver Affiliates as necessary expenses of operation of the Facilities without further order of the Court, subject to the Court's final approval upon the Receiver's final accounting and the Court's discharge of the Receiver.

GG.    For its services under this Order, not including any fees or expenses of any Receiver Affiliates (which shall be paid as operating expenses of the Receivership Estate as provided herein), the Receiver shall receive a monthly fee equal to one percent (1%) of the monthly gross revenue from the Facilities, plus the Receiver's actual, reasonable and necessary out-of-pocket expenses directly related to the performance of the Receiver's duties under this Order, including, but not limited to, local housing, meals, travel, local transportation, and

23

transportation to and from (i) the Facilities and/or the Court and (ii) the Receiver's primary office or residence.

HH.    Fees and expenses payable to the Receiver and Receiver Affiliates under this Order shall be treated as priority administrative claims against the Receivership Estate, and payment of such amounts in accordance with this order shall take priority over payment of any claims arising prior to the date on which the Receiver is appointed (including, but not limited to, claims of the Lender with respect to the Loans).

### Administrative Matters

II.    The Receiver may only be removed by order of this Court upon appropriate motion, notice, and hearing, after a showing of good cause by the Lender or the Contour Borrowers.

JJ.    Within 14 days of the Receiver's acceptance of appointment, the Contour Borrowers and, to the extent the information is in the possession of a management company (the "*Manager*"), Manager shall provide the Receiver with a sworn statement listing: (a) the identity, location and estimated value of all property, books, records, contracts and other assets related to and/or appurtenant to the Facilities; (b) the names, identities, and contact information (telephone, mailing address, and email address) of all management companies, managers, employees, contractors, subcontractors, accountants, attorneys, other personnel, and any other agents providing goods or services to or in connection with the Facilities; (c) a complete inventory of the Facilities' assets and liabilities, including any ongoing litigation related to the Facilities or their operations; and (d) copies of all Contracts and Licenses, agreements, leases, and service agreements related to the Facilities.

KK.    Starting thirty (30) days after entry of this Order, and within twenty (20) days after

24

the end of each calendar month thereafter, the Receiver shall file with this Court monthly reports concerning the financial results of the operation of the Receivership Estate.

LL.    The Receiver may seek direction from this Court on any matter related to this Order, including, but not limited to, relief from or modification of the provisions of this Order.

MM.    The Receiver may seek such other and further orders of this Court as it deems necessary or expedient to carry out its duties and responsibilities under this Order.

NN.    The Receiver may resign and be discharged of its responsibilities at any time by giving thirty (30) days' prior written notice to this Court; provided, however, that the Receiver may petition this Court to approve such resignation and discharge upon shorter notice for good cause shown.

OO.    At the completion of its duties set forth in this Order, or at such earlier time as the Receiver has determined that the purposes of this Order may no longer be effectively fulfilled by the Receiver, the Receiver may file a motion seeking to terminate its responsibilities as Receiver and the Court supervision of the Receivership Estate.

PP.    Upon the satisfaction and discharge of all indebtedness and obligations secured under the Contour Loan Documents, the Court shall enter an Order, as appropriate, terminating the receivership.

QQ.    As needed until the Receiver is fully ready to begin exercising its authorities and powers as set forth above, the Contour Borrowers, and Manager shall avoid harm to the Receivership Estate and ensure the Receiver can carry out its responsibilities as required by this Order.

RR.    The Contour Borrowers, Manager and their successors, assigns, agents, employees, members, attorneys, or anyone acting for or in concert with them shall be prohibited from: (i)

25

4898-2533-7162.3

possessing or managing the Facilities (unless requested or approved by the Receiver) and from interfering in any way with the possession or management of the Facilities by the Receiver; (ii) collecting, withdrawing, transferring, conveying, concealing, or otherwise disposing of the Contour Collateral, including any revenues and profits derived therefrom, during and pending the appointment of the Receiver; (iii) removing any property from the Facilities and from removing, destroying, concealing, changing, or altering in any manner any of the books or records relating to the ownership, possession, or operating of the Facilities and other Contour Collateral.

SS.    Further, the Contour Borrowers are required to pay to the Receiver any rents, revenues and other cash collateral in their possession or control derived from the Facilities and other Contour Collateral, and are required to immediately pay and turn over to the Receiver and to perform all other acts necessary to transfer to the Receiver all funds on hand in cash and all funds held in deposit accounts for the benefit of the Facilities or arising from the ownership, possession, or operating of the Facilities and all accounts, accounts receivable, and any other collectibles, and all keys, books, records, equipment, and all things in any manner related to the ownership, possession, or operation of the Facilities.  For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the Lender shall continue to administer and control all funds and accounts established under the terms of the Contour Loan Documents.

TT.    Further, the Contour Borrowers and any other party with notice of this Court's order are prohibited from prosecuting any claim against the Receiver or the Contour Collateral, other than in this action and only after a proper motion is filed and an order entered allowing such party to file such a claim herein.

### Effect of Order and Jurisdiction

UU.    Except as expressly set forth in this Order, the terms and conditions of the Contour

26

Loan Documents and any documents related to the Contour Loan Documents, including the rights, property, powers, authority and assets conferred in such documents, remain in full force and effect.

VV.    Except as expressly set forth in this Order, nothing in this Order shall act to divest in any way the Lender of any collateral, property or asset under the control of the Lender or enjoin or otherwise prohibit the Lender from pursuing any other remedies as provided in the Contour Loan Documents. All of the Lender's claims and causes of action against the Contour Borrowers shall be preserved and shall not be deemed waived, compromised, released or prejudiced in any way by this receivership proceeding. This receivership proceeding shall not bar or preclude the Lender, under the doctrines of collateral estoppel, res judicata, or any other doctrine or preclusion, from asserting or maintaining any claims or causes of action against the Contour Borrowers, including, but not limited to, any claims or causes of action for recovery of amounts owed under the Contour Loan Documents or proceedings by foreclosure, either non-judicial or judicial, or otherwise to sell the Contour Collateral or any portion of the Contour Collateral.

WW.    Nothing in this Order shall relieve the Contour Borrowers or the Facilities of any obligation or liability under any existing judgment, order or decree.

XX.    Until the Receiver is discharged and this receivership is terminated, the Court retains jurisdiction over this matter to: (i) amend, supplement or delete any provision of this Order; (ii) enforce compliance with or to punish violations of this Order; and (iii) order any additional actions or remedies as may be appropriate or reasonably necessary.

YY.    The reversal or modification on appeal of this Order shall not affect the validity of any actions taken in good faith by the Receiver, the payment of compensation to which the Receiver or Receiver Affiliates are entitled, or the payment of expenses incurred by the Receiver

27

4898-2533-7162.3

or Receiver Affiliates pursuant to this Order.

ZZ.    This Order shall be immediately effective upon its entry and shall continue until further order of this Court.

DONE and ORDERED the ___ day of _____, 2025.

_____
U.S. DISTRICT JUDGE


**APPROVED AND AGREED TO:**

COUNSEL FOR THE CONTOUR BORROWERS

_____
Charles Denaburg
Frank C. Galloway III
David Schoel
**The Woodcrest Group, LLC**
2200 Woodcrest Place, Suite 315
Birmingham, AL 35209
Phone: 205-807-9763
cld@woodcrestgroup.law
fcg3@woodcrestgroup.law
dds@woodcrestgroup.law


COUNSEL FOR THE WELLS FARGO BANK, N.A.

_____
N. Christian Glenos (ASB-0784-L48N)
Macy Walters (ASB-4358-E175)
**Bradley Arant Boult Cummings, LLP**
1819 Fifth Avenue North
Birmingham, AL 35203
Phone:  205-521-8000
cglenos@bradley.com
mwalters@bradley.com

28

4898-2533-7162.3