FILED
2025 Dec-16 AM 10:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WELLS FARGO BANK, N.A.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO:** |
| | § | **2:25-cv-02136-GMB** |
| **CONTOUR BUCKINGHAM AL LLC,** | § | |
| **CONTOUR CALLINGTON AL LLC,** | § | |
| **and CONTOUR CARLYLE AL LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**BRIEF IN SUPPORT OF PLAINTIFF WELLS FARGO BANK, N.A.'S
MOTION FOR APPOINTMENT OF RECEIVER**

Plaintiff Wells Fargo Bank, N.A. ("***Lender***") files this brief in support of its *Motion for Appointment of Receiver* (the "***Receiver Motion***"). In support, Lender respectfully states as follows:

**INTRODUCTION**

Lender, pursuant to Rule 66 of the Federal Rules of Civil Procedure and under the inherent equitable powers of this Court, requests the appointment of a receiver to take possession and control of the Contour Collateral (as defined below), including three large, multi-family apartment complexes in the Birmingham area owned by the Contour Borrowers (as defined below) comprised of 1,796 residential units. Lender seeks an order for the appointment of a receiver on grounds that, without limitation, the Contour Borrowers have consented to the appointment of a receiver, the Contour Borrowed have defaulted under and wholly lack the financial ability to repay their loans, the Contour Collateral is in imminent danger, and Lender lacks an adequate remedy at law.

The appointment of a receiver is proper because the Contour Borrowers have contractually consented to the appointment of a receiver and, regardless, the equitable considerations weigh

1

decisively in favor of such appointment.  Accordingly, for the reasons set forth below and in the *Verified Original Complaint* (the "**Complaint**"), Lender respectfully requests that the Court enter the proposed *Agreed Order Appointing Receiver* (the "**Agreed Receivership Order**") attached to the Receiver Motion as **Exhibit 1**.

<strong><u>STATEMENT OF FACTS</u></strong>

### A.  The Buckingham Loan

1.      Contour Buckingham AL LLC ("**Contour Buckingham**" or "**Buckingham**") is the owner of a 563-unit residential apartment complex situated at 114 Aspen Circle, Homewood, Alabama, commonly known as "The Park at Buckingham" (the "**Buckingham Facility**").

2.      On or about September 30, 2022, Lender made a term loan to Buckingham in the original principal amount of $60,000,000.00 (the "**Buckingham Loan**").

3.      The Buckingham Loan is evidenced by, among other things, that certain Term Loan Note dated September 30, 2022, executed by Buckingham in favor of Lender, as amended by that certain First Amendment to Term Loan Note dated May 31, 2023 (collectively as amended, the **Buckingham Note**").  A true and correct copy of the Buckingham Note is attached to the Complaint as **Exhibit 1**.

4.      To induce Lender to make the Buckingham Loan, Buckingham executed a Security Agreement dated September 30, 2022 in favor of Lender, granting Lender a first-priority security interest in all personal property of Buckingham, including, but not limited to, all accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, and deposit accounts described in the Security Agreement and Schedule 1 to the Security Agreement (collectively, the **"Buckingham Security Agreement"**). A true and correct copy of the Buckingham Security Agreement is attached to the Complaint as **Exhibit 2.**

5.     Lender perfected its security interest in the collateral described in the Buckingham Security Agreement through filing a UCC financing statement with the Delaware Department of State as U.C.C. Initial Filing No. 20228185712 (the **"*Buckingham UCC-1*"**).  A true and correct copy of the Buckingham UCC-1 is attached to the Complaint as **Exhibit 3.**

6.     As further security for Buckingham's obligations to Lender in connection with the Buckingham Loan, Buckingham executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated September 30, 2022, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on October 6, 2022 as Instrument No. 2022104961 (the **"*Buckingham Mortgage*"**). The Buckingham Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Buckingham Facility, as more particularly described in Exhibit A to the Buckingham Mortgage.  A true and correct copy of the Buckingham Mortgage is attached to the Complaint as **Exhibit 4.**

7.     The Buckingham Note, the Buckingham Security Agreement, the Buckingham UCC-1, the Buckingham Mortgage, the First Buckingham Forbearance Agreement (as hereinafter defined), the Second Buckingham Forbearance Agreement (as hereinafter defined), and any and all other documents evidencing, describing, securing, or relating to the Buckingham Loan are herein referred to as the **"*Buckingham Loan Documents.*"**  The real and personal property collateral described in the Buckingham Loan Documents is collectively referred to herein as the **"*Buckingham Collateral*."**

8.     Pursuant to the terms of the Buckingham Loan Documents, the Buckingham Collateral secures all of Buckingham's obligations under the Buckingham Loan Documents.

3

**B. The Callington/Carlyle Loan**

9.      Contour Callington AL LLC ("*Contour Callington*" or "*Callington*") is the owner of a 604-unit residential apartment complex situated at 700 Aspen Drive, Birmingham, Alabama, commonly known as "The Park at Callington" (the "*Callington Facility*").

10.     Contour Carlyle AL LLC ("*Contour Carlyle*" or "*Carlyle*") is the owner of a 629-unit residential apartment complex situated at 200 Robert Jemison Drive, Birmingham, Alabama, commonly known as "The Park at Carlyle" (the "*Carlyle Facility*" and, collectively with the Buckingham Facility and the Callington Facility, the "*Facilities*").

11.     On or about January 27, 2023, Lender made a term loan to Callington and Carlyle in the original principal amount of $85,000,000.00 (the "*Callington/Carlyle Loan*").

12.     The Callington/Carlyle Loan is evidenced by, among other things, that certain Term Loan Note dated January 27, 2023 executed by Callington and Carlyle in favor of Lender, as amended by that certain First Amendment to Term Loan Note dated May 31, 2023, and as further amended by that certain Second Amendment to Term Loan Note dated August 22, 2023 (collectively as amended, the "*Callington/Carlyle Note*"). A true and correct copy of the Callington/Carlyle Note is attached to the Complaint as **Exhibit 5.**

13.     To induce Lender to make the Callington/Carlyle Loan, Callington and Carlyle executed a Security Agreement dated January 27, 2023 in favor of Lender, granting Lender a security interest in all of their respective personal property, including, but not limited to, all accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, and deposit accounts described in the Security Agreement and Schedule 1 to the Security Agreement (collectively, the "*Callington/Carlyle Security*

*Agreement*").  A true and correct copy of the Callington/Carlyle Security Agreement is attached to the Complaint as **Exhibit 6.**

14.    Lender perfected its security interest in the collateral described in the Callington/Carlyle Security Agreement through the filing of two (2) UCC financing statements with the Delaware Department of State: (1) U.C.C. Initial Filing No. 20230733096 (the "*Callington UCC-1*"); and (2) U.C.C. Initial Filing No. 20230733195 (the "*Carlyle UCC-1*"). True and correct copies of the Callington UCC-1 and Carlyle UCC-1 are attached to the Complaint as **Exhibits 7 and 8**.

15.    As further security for Callington's obligations to Lender in connection with the Callington/Carlyle Loan, Callington executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated January 27, 2023, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on February 7, 2023 as Instrument No. 2023009940 (the "*Callington Mortgage*"). The Callington Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Callington Facility, as more particularly described in Exhibit A to the Callington Mortgage. A true and correct copy of the Callington Mortgage is attached to the Complaint as **Exhibit 9**

16.    As further security for Carlyle's obligations to Lender in connection with the Callington/Carlyle Loan, Carlyle executed and granted that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing to Lender dated January 27, 2023, as recorded with the Office of the Judge of Probate of Jefferson County, Alabama, on February 7, 2023 as Instrument No. 2023009941 (the "*Carlyle Mortgage*"). The Carlyle Mortgage conveyed to Lender a security interest in and to the real property and improvements comprising the Carlyle Facility,

as more particularly described in Exhibit A to the Carlyle Mortgage. A true and correct copy of the Carlyle Mortgage is attached to the Complaint as **Exhibit 10.**

17.    The Callington/Carlyle Note, the Callington/Carlyle Security Agreement, the Callington UCC-1, the Carlyle UCC-1, the Callington Mortgage, the Carlyle Mortgage, the First Callington/Carlyle Forbearance Agreement (as hereinafter defined), the Second Callington/Carlyle Forbearance Agreement (as hereinafter defined), and any and all other documents evidencing, describing, securing, or relating to the Callington/Carlyle Loan are herein referred to as the **"*Callington/Carlyle Loan Documents.*"**    The real and personal property collateral described in the Callington/Carlyle Loan Documents is collectively referred to herein as the **"*Callington/Carlyle Collateral.*"**

18.    Pursuant to the terms of the Callington/Carlyle Loan Documents, the Callington/Carlyle Collateral secures all of Callington and Carlyle's obligations under the Callington/Carlyle Loan Documents.

**C.  The Contour Borrowers' Events of Default, Acceleration, and First Forbearance**

19.    Buckingham, Callington, and Carlyle (collectively, the **"*Contour Borrowers*"**) have failed to pay and perform their respective obligations under the Buckingham Loan Documents and Callington/Carlyle Loan Documents.

20.    The following defaults occurred under the Buckingham Loan Documents (collectively, the **"*Buckingham Pre-Forbearance Defaults*"**):

a.    Buckingham failed to remit the May 10, 2024 and June 10, 2024 required payments of principal and interest due under the Buckingham Loan Documents; and

b.      As of the March 31, 2024 test date, Buckingham failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 as required by the Buckingham Loan Documents.

21.      Likewise, Callington and Carlyle failed to remit the April 10, 2024, May 10, 2024, and June 10, 2024 scheduled payments of principal and interest due under the Callington/Carlyle Loan Documents (collectively, the "***Callington/Carlyle Pre-Forbearance Defaults***").

22.      On June 10, 2024, Lender gave the Contour Borrowers written notice of the Buckingham Pre-Forbearance Defaults and the Callington/Carlyle Pre-Forbearance Defaults. A true and correct copy of the June 10, 2024 written notices are attached to the Complaint as **Exhibits 11 and 12**.

23.      As a result of the Pre-Forbearance Defaults, Lender entered into Forbearance Agreements with the Contour Borrowers.

24.      Lender entered into a Forbearance Agreement with Buckingham dated June 25, 2024 (the "***First Buckingham Forbearance Agreement***"), pursuant to which Lender accelerated the entire amount due under the Buckingham Loan Documents but agreed to forbear from exercising its rights and remedies on account of the Buckingham Pre-Forbearance Defaults until August 31, 2024. A true and correct copy of the First Buckingham Forbearance Agreement is attached to the Complaint as **Exhibit 13**.

25.      Under Section 2(a) of the First Buckingham Forbearance Agreement, Buckingham agreed to pay the "May 10, 2024 and June 10, 2024 scheduled monthly payments" that were delinquent and "otherwise bring any amounts due or delinquent under the Note current" no later than June 28, 2024. *See* **Compl., Exhibit 13, ¶ 2(a).**

26.     Lender entered into a Forbearance Agreement with Callington and Carlyle on June 25, 2024 (the "*First Callington/Carlyle Forbearance Agreement*"), pursuant to which Lender accelerated the entire amount due under the Callington/Carlyle Loan Documents but agreed to forbear from exercising its rights and remedies on account of the Callington/Carlyle Pre-Forbearance Defaults until August 31, 2024. A true and correct copy of the First Callington/Carlyle Forbearance Agreement is attached to the Complaint as **Exhibit 14**.

27.     Under Section 2(a) of the First Callington/Carlyle Forbearance Agreement, Callington and Carlyle agreed to pay Lender "the April 10, 2024, May 10, 2024, and June 10, 2024 scheduled monthly payments" that were delinquent and "otherwise bring any amounts due or delinquent under the Note current" no later than June 28, 2024. *See* **Compl., Exhibit 14, ¶ 2(a).**

**D.  The Contour Borrowers' Forbearance Defaults and the First Collection Action**

28.     Despite ample opportunity to cure their defaults, the Contour Borrowers failed to pay and perform their respective obligations under both the First Buckingham Forbearance Agreement and the First Callington/Carlyle Forbearance Agreement.

29.     In fact, during the time the Contour Borrowers were supposed to be curing their pre-existing defaults under their respective First Forbearance Agreements, the Contour Borrowers added additional defaults under both the Buckingham Loan Documents and the Callington/Carlyle Loan Documents.

30.     Buckingham failed to pay and perform its respective obligations under the First Buckingham Forbearance Agreement and added additional defaults under the Buckingham Loan Documents, including, without limitation, the following (collectively, the "*Buckingham Forbearance Defaults*"):

8

a.  Contour Buckingham failed to remit required payments of principal and interest due under the Buckingham Loan Documents;

b.  Contour Buckingham failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 for the March 31, 2024, June 30, 2024, September 30, 2024, and December 31, 2024 calendar quarters; and

c.  Contour Buckingham failed to pay the 2023 and 2024 real property taxes assessed against the Buckingham Mortgage Property.

31.  Similarly, Callington and Carlyle failed to pay and perform their respective obligations under the First Callington/Carlyle Forbearance Agreement and added multiple defaults under the Callington/Carlyle Loan Documents, including, without limitation, the following (collectively, the "***Callington/Carlyle Forbearance Defaults***"):

a.  Callington and Carlyle failed to remit required payments of principal and interest due under the Callington/Carlyle Loan Documents;

b.  Callington and Carlyle failed to maintain the required Debt Service Coverage Ratio of not less than 1.25 to 1.00 for the June 30, 2024, September 30, 2024, and December 31, 2024 calendar quarters; and

c.  Callington and Carlyle failed to pay the 2023 and 2024 real property taxes assessed against the Callington and Carlyle Mortgaged Properties.

32.  On February 10, 2025, Lender gave the Contour Borrowers written notice of their Forbearance Defaults under both the Buckingham Loan and the Callington/Carlyle Loan. Lender declared the entire amounts outstanding on both loans to be immediately due and payable and demanded payment in full of the Loans from the Contour Borrowers. True and correct copies of

the February 10, 2025 notices of acceleration and demand for payment are attached to the Complaint as **Exhibits 15 and 16**.

33.     The Contour Borrowers failed to cure their Forbearance Defaults and Lender filed a creditors' action against the Contour Borrowers on May 5, 2025 in this Court seeking the appointment of a receiver over the Facilities, and other relief. *See Wells Fargo Bank, N.A., v. Contour Buckingham AL, LLC, et al*, Civil Action No. 2:25-cv-00789 (the "*First Collection Action*").

### E.  The Contour Borrowers' Second Forbearance Agreements and Defaults

34.     Lender entered into second round of Forbearance Agreements with the Contour Borrowers pursuant to which Lender agreed to dismiss the First Collection Action *without prejudice* and the Contour Borrowers agreed, among other things, that Lender would be entitled to the immediate entry of an Agreed Order Appointing Receiver if the Contour Borrowers failed to repay the loans by August 31, 2025.

35.     On June 18, 2025, Lender entered into a Second Forbearance Agreement with Buckingham (the *"Second Buckingham Forbearance Agreement"*), pursuant to which Lender granted Buckingham until the earlier of August 31, 2025 or the occurrence of any new defaults by Buckingham to repay the remaining balance of $62,897,111.56 on the Buckingham Loan in full. In consideration for Lender's commitment to forbear, Buckingham agreed to the appointment of a receiver over the Contour Collateral (as defined hereinafter) in the event new defaults occurred and/or it otherwise failed to pay in full its indebtedness to Lender under the Loan Documents within the time period prescribed in the Second Buckingham Forbearance Agreement. A true and correct copy of the Second Buckingham Forbearance Agreement is attached to the Complaint as **Exhibit 17.**

36.     On June 18, 2025, Lender entered into a Second Forbearance Agreement with Callington and Carlyle (the *"Second Callington/Carlyle Forbearance Agreement"*), pursuant to which Lender granted Callington and Carlyle until the earlier of August 31, 2025 or the occurrence of any new defaults by Callington or Carlyle to repay the remaining balance of $89,047,277.28 on the Callington/Carlyle Loan in full. In consideration for Lender's commitment to forbear, Callington and Carlyle agreed to the appointment of a receiver over the Contour Collateral (as defined hereinafter) in the event new defaults occurred and/or they otherwise failed to pay in full their indebtedness to Lender under the Loan Documents within the time period prescribed in the Second Callington/Carlyle Forbearance Agreement. A true and correct copy of the Second Callington/Carlyle Forbearance Agreement is attached to the Complaint as **Exhibit 18.**

37.     Pursuant to the terms of the Second Buckingham Forbearance Agreement and the Second Callington/Carlyle Forbearance Agreement (collectively, **"the Second Forbearance Agreements"**), Lender filed a Notice of Dismissal Without Prejudice of the First Collection Action on July 8, 2025, and the Contour Borrower's delivered to Lender an Agreed Order Appointing Receiver to be held in trust in the event the Contour Borrower's committed new defaults or otherwise failed to repay the loans on or before August 31, 2025.

38.     The Contour Borrowers failed to repay their loans by August 31, 2025, and remain in default under both the Buckingham Loan Documents and Callington/Carlyle Loan Documents (collectively, *"the Contour Loans"*). As a result, all amounts owing under the Contour Loans are immediately due and payable to Lender.

39.     The Contour Loans are secured by the Buckingham Collateral and the Callington/Carlyle Collateral (collectively, the "*Contour Collateral*"). In violation of Sections 4.2 and 4.4 of the Contour Mortgages, the Contour Borrowers have permitted tax liens to accrue

against the Contour Collateral which are harming Lender's rights and interests therein.  Without limitation, the Contour Borrowers have failed to pay the 2024 ad valorem taxes on the Contour Collateral that were due on October 1, 2024 in the amount of $2,058,500; Contour Buckingham has recently become the subject of a recent federal tax levy in the amount of $100,525.69; Contour Callington has recently become the subject of a state unemployment tax lien in the amount of $83,466.46; and Contour Buckingham and Contour Callington have become the subject of mechanics' liens. True and correct copies of the Contour Borrowers' aforementioned unpaid tax obligations and liens are attached to the Complaint as **Exhibits 19, 20, 21, 22 and 23**.

40.     Contour Callington and Contour Carlyle have reported to Lender that they had net operating income for 2024 that exceeded their loan payment obligations to Lender for 2024 by over $630,000, yet they failed to remit all required loan payments to Lender. This fact suggests that these Contour Borrowers may be diverting rents from the Facilities (which are Lender's collateral) for purposes unrelated to the preservation and operation of the Facilities, thereby subject Lender to further harm.

41.     As of December 12, 2025, the amount due under the Buckingham Loan Documents (exclusive of attorneys' fees and other costs of collection) was $62,979,247.17, which consists of $58,878,226.00 in unpaid loan principal and $4,101,021.17 in accrued interest thereon.  Interest, fees, legal fees, collection costs, and other charges continue to accrue in accordance with the terms of the Buckingham Loan Documents.  Without limitation, interest continues to accrue at the default rate of interest in the amount of $16,330.25 per day.

42.     As of December 12, 2025, the amount due under the Callington/Carlyle Loan Documents (exclusive of attorneys' fees and other costs of collection) was $89,979,936.72, which consists of $84,029,452.01 in unpaid loan principal and $5,950,484.71 in accrued interest thereon.

12

Interest, fees, legal fees, collection costs, and other charges continue to accrue in accordance with the terms of the Callington/Carlyle Loan Documents. Without limitation, interest continues to accrue at the default rate of interest in the amount of $23,772.94 per day.

43.    Pursuant to the Buckingham Loan Documents and the Callington/Carlyle Loan Documents, the Contour Borrowers are also liable for the costs and expenses incurred by Lender in connection with the Contour Borrowers' obligations under all the Contour Loans, including, without limitation, attorneys' fees and other costs of collection and/or enforcing the Contour Loans, and costs of insuring, protecting, maintaining, or disposing of the Contour Collateral, which costs and expenses continue to accrue.

## ARGUMENT

The decision to appoint a receiver is an equitable one which rests "in the sound discretion of the [C]ourt." *Hutchinson v. Fidelity Inv. Ass'n*, 106 F.2d 431, 463 (4th Cir. 1939). This Court should enter the Agreed Receivership Order and appoint a receiver over the Collateral pursuant to Rule 66 of the Federal Rules of Civil Procedure because (a) Lender is contractually entitled as a matter of right to appointment of a receiver to take control of the Contour Collateral; and (b) even if Lender was not contractually entitled to the appointment of a receiver, the equitable considerations under federal common law weigh heavily in favor of such appointment.

### A. The Loan Documents Expressly Provide for the Appointment of a Receiver.

Appointment of a receiver in this matter is proper because the Contour Borrowers expressly agreed that, upon an event of default, Lender is entitled "as a matter of strict right" to the appointment of a receiver to take control of the Contour Collateral, including, but not limited to, the right to receive the rents, issues, and profits flowing from the Contour Collateral.

13

Specifically, Sections 5.2 of Buckingham Mortgage, the Callington Mortgage, and the Carlyle Mortgage provide:

> Upon the occurrence of any Default, and at any time thereafter, [Lender] shall have all of the following rights and remedies: … (d) To apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Subject Property as a matter of strict right and without regard to: (i) the adequacy of the security for the repayment of the Secured Obligations; (ii) the existence of a declaration that the Secured Obligations are immediately due and payable; or (iii) the filing of a notice of default; and Mortgager consents to such appointment.

*See* Exhibits 4, 9 & 10 to the Complaint.

Similarly, via the execution of the Second Forbearance Agreements, the Contour Borrowers expressly agreed that, upon an event of default or failure to pay their indebtedness to Lender, Lender is entitled to the immediate filing of a Stipulation for Appointment of a Receiver over the Collateral and Agreed Order Appointing Receiver, which allows for the appointment of a receiver to take control of the Contour Collateral, including, but not limited to, the right to receive the rents, issues, and profits flowing from the Contour Collateral. Specifically, Sections 2(b) of the Second Forbearance Agreements provide:

> Borrower and Guarantors hereby acknowledge, agree, covenant, represent, and warrant that Bank shall be entitled to the immediate appointment of a receiver over the Collateral in the event a New Default occurs or the Borrower fails to pay the Indebtedness to Bank in full prior to the expiration of the Forbearance Period. Accordingly, and to effectuate Bank's right to the immediate appointment of a receiver over the Collateral in the event a New Default occurs or the Indebtedness is not paid prior to expiration of the Forbearance Period, Borrower shall deliver to Bank's counsel on the Effective Date the Acceptance of Service of Summons and Complaint and Stipulation for Appointment of a Receiver over the Collateral attached hereto as **Exhibit C** signed by Borrower and its counsel (the "Stipulation") and the Agreed Order Appointing Receiver attached hereto as **Exhibit D** signed by Borrower's counsel (the "Agreed Order"). The executed Stipulation and Agreed Order shall be deposited and held in escrow with Bank's counsel during the Forbearance Period and shall be released from escrow to Bank upon the Termination Date. After the Termination Date, Borrower and Guarantors expressly authorize Bank and its counsel to file the Stipulation and Agreed Order in the Civil Action or any other creditor's action filed by Bank in the future and shall reasonably cooperate with Bank to obtain the court's entry of the Agreed Order.

14

*See* Exhibits 17 and 18 to the Complaint (emphasis in original).

Federal courts have held that the appointment of a receiver is appropriate where, like here, the parties have contractually agreed to a receivership. *See, e.g., Bank of New York Mellon v. Jefferson Co., Ala.*, 2009 WL 10704121 at *6 (N.D. Ala. June 12, 2009) (citing numerous federal courts who have recognized that the appointment of a receiver is appropriate in cases involving private sector entities where the parties have contractually agreed to a receivership); *Wachovia Bank, N.A. v. Bon Secour Village, L.L.C.*, 2008 WL 11524331, at *2 (S.D. Ala. Mar. 19, 2008)[1]; *Am. Bank and Trust Co. v. Bond Intern. Ltd.*, 2006 WL 2385309, at *7 (N.D. Okla. Aug. 17, 2006) ("Appointment of a receiver is appropriate where the parties have contractually agreed to a receivership."); *Pioneer Cap. Corp. v. Environamics Corp.*, 2003 WL 345349, at *9 (D. Me. Feb. 14, 2003), *aff'd*, 2003 WL 1923765 (D. Me. Apr. 23, 2003) (concluding that "the existence of an express contractual right to appointment of a receiver, coupled with 'adequate prima facie evidence of a default,' can be sufficient to warrant such an appointment"); *U.S. Bank, Nat. Ass'n v. CB Settle Inn Ltd. P'ship*, 827 F. Supp. 2d 993, 998 (S.D. Iowa 2011); *see also* Restatement Third of Property: Mortgages § 4.3 ("A mortgagee is entitled to the appointment of a receiver to take possession of the real estate if the mortgagor is in default under the mortgage and the mortgage or other agreement contains…a provision authorizing appointment of a receiver to take possession and collect rents upon mortgagor default.").

---

[1] Lender acknowledges that another judge in the Southern District of Alabama has disagreed with the opinion in *Bon Secour* to the extent that it found the plaintiff was entitled to the appointment of a receiver based solely on the terms of the contract. *See PNC Bank, N.A. v. Presbyterian Retirement Corp., Inc.*, No. 14-0461-WS-C, 2014 WL 6065778 (S.D. Ala. Nov. 13, 2014).

As a result, Lender is entitled to the appointment of a receiver pursuant to the express terms of the Buckingham Mortgage, the Callington Mortgage, and the Carlyle Mortgage, as well as the express terms of the Second Forbearance Agreements.

**B. Federal Common Law Also Supports the Appointment of a Receiver.**

In addition to being contractually entitled to the appointment of a receiver, federal common law supports the appointment of a receiver in this action.

Federal courts have recognized many factors that are relevant for a court to consider when determining the appropriateness of a receiver, including: (1) fraudulent conduct on the part of the defendant; (2) imminent danger that property will be lost or squandered; (3) the inadequacy of available legal remedies; (4) the probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; (5) the plaintiff's probable success in the action and the possibility of irreparable injury to its interest in the property; and (6) whether the interests of the plaintiff and others sought to be protected will in fact be well served by the receivership. *See Bank of New York Mellon*, 2009 WL 10704121 at *7 (citing *Consol. Rail Corp. v. Fore River Railway Co.*, 861 F.2d 322 (1st Cir. 1988))[2]; *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241-42 (5th Cir. 1997); *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir. 1993).

As discussed below, these factors weigh in favor of appointing a receiver to take possession and control of the Contour Collateral in this action.

---

[2] The Eleventh Circuit has cited *Consolidated Rail Corp.* for the "six factors federal courts may consider in determining whether to appoint a receiver." *Nat'l P'ship Inv. Corp. v. Nat'l Housing Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998).

**1.  There is imminent danger to the Contour Collateral.**

The Contour Collateral faces imminent danger of waste, loss, dissipation and/or impairment if a receiver is not appointed. As stated herein and in the Complaint, the Contour Borrowers have repeatedly shown an inability to pay their financial obligations related to the Facilities, including their indebtedness to Lender. The Contour Borrowers' historical failure to meet monetary responsibilities provides no assurance that they are now able or would in the future become able to generate sufficient monies to pay operating expenses for the Facilities. This not only jeopardizes the value of the Contour Collateral, but further jeopardizes the living conditions for residents of the Facilities. If the Contour Borrowers are unable to generate sufficient income to pay the expenses associated with operating the Facilities, such as debt service, property taxes, payroll taxes, necessary repairs, landscaping, and routine maintenance, the living conditions at the Facilities will deteriorate rapidly – which, in turn, will lead to the current tenants leaving the Facilities and further diminish the primary stream of income for the Facilities. As a result, there is an imminent danger of the Contour Collateral (including the proceeds therefrom) being diminished in value if a receiver is not appointed.

Worse still, the Contour Borrowers have failed to pay federal and state taxes related to the Facilities which is subjecting the Contour Collateral, and Lender's interests therein, to imminent danger.  The Contour Borrowers' failure to pay ad valorem taxes on the Facilities alone has subjected the Contour Collateral to liens in excess of $2 million with priority over Lender's security interests.  The Contour Borrowers have also failed to pay federal payroll taxes resulting in the issuance of a federal tax levy in the amount of $100,525.69, as well as state unemployment taxes in the amount of $83,466.46, thereby subjecting the Contour Collateral to liens for said amounts that may potentially prime Lender's security interests.  The Contour Borrowers have also

17

failed to pay contractors, resulting in mechanics' liens being filed against the Contour Collateral totaling $138,470.18,

Finally, as each day passes and the rents from the Facilities assigned to Lender are expended by the Contour Borrowers rather than applied to the Contour Loans, the Lender is harmed as those rents can never be recouped or otherwise generated again.

### 2. Other available legal remedies are inadequate.

Money damages in favor of Lender against the Contour Borrowers are not an adequate remedy. The Contour Borrowers have shown a consistent inability to meet their monetary obligations, including debt service payments, ad valorem property taxes, federal payroll taxes and state unemployment taxes. Given that the Contour Borrowers clearly lack the financial ability to pay their financial obligations, monetary damages are inadequate in this matter and will not prevent further harm to Lender. As aptly stated by the Northern District of Florida in a case where a receiver was appointed for an apartment complex under similar circumstances: "Plaintiff's legal remedies are profoundly inadequate. An action for damages cannot adequately compensate Plaintiff since the debtor on the note does not have the funds to make the payments as agreed." *Cadence Bank, N.A. v. Manausa Holdings, LLC*, 2022 WL 1252494, at *3 (N.D. Fla. Mar. 30, 2012).

Similarly, foreclosure of the Facilities is not an adequate remedy for Lender under the circumstances, particularly given the outstanding balance of the Contour Loans and the size and scale of the Facilities, which include 1,796 residential units. Without limitation, a foreclosure on the courthouse steps would not afford Lender and the Contour Borrowers a reasonable mechanism to properly market the Facilities or afford prospective bidders the ability to conduct reasonable due diligence or secure financing. Additionally, the one-year statutory right of redemption which

18

would arise from a foreclosure sale would cloud title and likely have a chilling effect on bidding by potential purchasers.  Foreclosing on the Facilities without other additional relief would be disastrous for all parties involved and would potentially impact the residents of the Facilities.  By contrast, a federal receiver would have the statutory power under 28 U.S.C. § 2004 and § 2001, if warranted, to market and conduct a receiver's sale of the Facilities as a going concern, "free and clear" of liens and encumbrances, to a financially viable owner, thereby maximizing the value of the properties for the benefit of all interested parties.

If the Court does not appoint a receiver and the Facilities go out of business or otherwise continue to deteriorate, Lender will be harmed because the Contour Borrowers have insufficient assets to satisfy any money judgment.  In an effort to protect Lender's interest in this specific scenario, the Contour Loan Documents intentionally provided for, and the Contour Borrowers expressly consented to, the appointment of a receiver. Thus, the best opportunity for recovery in this matter is through the appointment of an experienced federal receiver to control, stabilize, rehabilitate and, if warranted, market and sell the Facilities.

**3.   The benefits of a receivership outweigh the burdens on the affected parties.**

The appointment of a receiver will do far more good than harm. All parties, including Lender, other creditors, and the residents of the Facilities, will benefit from the management of a receiver experienced in operating, stabilizing, and restructuring distressed apartment complexes. Not only will the appointment of a receiver help preserve the value of the Contour Collateral and improve the marketability of the same, but it will also provide a continuity of service to the current residents and any employes at the Facilities through any transition period. In the alternative, a shutdown of the facilities – which could be imminent if swift action is not taken – would result in over a thousand residents losing their housing.

Further, the burden on the Contour Borrowers if a receivership is appointed is minimal in this matter because the Contour Borrowers have stipulated to the appointment of a receiver in this action consenting to the relief requested in this Receiver Motion, as well as contractually consented to the appointment of a receiver in their Mortgages. *See New York Life Ins. Co. v. Watt West Inv. Corp.*, 755 F. Supp. 287, 293 (E.D. Cal. 1991) ("The [loan documents] specifically provide[] for the appointment of a temporary receiver in circumstances such as now exist. There is little hardship in enforcing the terms of the parties' bargain."); *Greystone Bank v. Tavarez*, 2010 WL 11651639, at *2 (E.D. N.Y. Apr. 26. 2010) (finding that the appointment of a receiver was warranted because the defendants contractually consented to the appointment of a receiver in the mortgage agreement and thus, there was "little hardship in enforcing the terms of the parties' bargain.").

Accordingly, the benefits of appointing a receiver to stabilize operations and maximize the value of the Contour Collateral as a going-concern far outweigh any burdens the Contour Borrowers may face from the same.

### 4. Lender has a high likelihood of success in the underlying action.

The probability of Lender's success on the general relief sought by the Complaint is extremely high. As evidenced by the verified facts, the Contour Borrowers have failed to comply with multiple payment obligations and other covenants in the Loan Documents. Setting aside all other equitable considerations, Lender is virtually certain to succeed in this action on its underlying breach of contract claims.

### 5. The interests of Lender and others will be well served by the receivership.

As discussed in Section (B)(3) *supra*, all parties, including Lender, other creditors, and the residents of the Facilities, will benefit from the management of a receiver experienced in operating, stabilizing, and restructuring distressed apartment complexes, under the oversight of this Court.

20

Notably, the appointment of a receiver will serve Lender's interests insofar as the receiver will, among other things, safeguard and preserve the Facilities and ensure that the assigned rents and other Contour Collateral are used to pay the Contour Borrowers' obligations to Lender and/or utilized to preserve, maintain and operate the Facilities.

### 6. Fraudulent conduct on the part of the Contour Borrowers

Lender is unaware at this juncture whether fraud has occurred. However, there is evidence to suggest that rents assigned to Lender are being diverted and used for purposes unrelated to the operation and preservation of the Facilities. Specifically, Contour Callington and Contour Carlyle have reported to Lender that they had net operating income for 2024 that exceeded their loan payment obligations to Lender for 2024 by over $630,000, yet they failed to remit all required loan payments to Lender. In other words, according to their own financial reporting, these Contour Borrowers had more than sufficient revenue after payment of their operating expenses to make all required debt service payments to Lender during 2024, yet they failed to do so. This fact suggests that these Contour Borrowers may be diverting rents from the Facilities assigned to Lender for purposes unrelated to the preservation and operation of the Facilities, thereby subject Lender to further harm.

### C. Proposed Receiver and Qualifications

Lender requests that Farbman Group be appointed receiver in this matter. Farbman Group is a full-service real estate organization that provides, among other things, property management, brokerage, construction, and maintenance services to real estate organizations seeking to maximize value and create stability for their assets. Since its inception in 1976, Farbman Group professionals have regularly served as court-appointed receivers for distressed companies in a wide range of industries and, currently, Farbman manages more than 25 million square feet of office, retail,

medical, industrial, and multi-family space, and is recognized as a leading commercial management and brokerage firm by a wide variety of individual and institutional clientele.

Further, Lender requests that Jonathon S. Margolis ("*Mr. Margolis*") direct Farbman Group's performance of the receiver's duties. Mr. Margolis is Senior Vice President of Asset Management at Farbman Group, where he regularly assists retailers, lenders, institutional clients, and investors, both inside and outside of bankruptcy, with real estate restructuring, asset management, sales and acquisitions, and distressed real estate. Mr. Margolis has served either as court-appointed receiver or as support for a Farbman Group court-appointed receiver in more than 20 different receiverships, many of which involved multi-family living facilities much like the Facilities at issue in this case.

As evidenced by Mr. Margolis' declaration attached as **Exhibit 2** to the Receiver Motion, Lender believes that Farbman Group's appointment as receiver is in the best interests of Lender, the Contour Borrowers, and any other parties who might assert an interest in the Contour Collateral and that Mr. Margolis has the requisite skills, experience, and resources to serve as the director of the receiver's duties in this case.

## CONCLUSION

This Court should grant the relief sought in the Complaint, enter the Agreed Receivership Order, and grant such other and further relief as this Court deems just and proper. The Contour Borrowers have contractually agreed to the appointment of a receiver, and Lender is further entitled to a receiver because a receiver is necessary to protect the Contour Collateral from imminent danger, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties. Thus, this Court should enter the Agreed Receivership Order appointing Farbman Group as receiver in this action.

Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS LLP**

BY:   */s/ N. Chris Glenos*

**N. CHRISTIAN GLENOS**
**Bar Number: ASB-0784-L48N**
**MACY WALTERS**
**Bar Number: ASB-4358-E175**
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
cglenos@bradley.com
mwalters@bradley.com

ATTORNEYS FOR WELLS FARGO BANK

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have delivered a copy of the document, via hand delivery, to be served with the complaint, as follows:

Contour Buckingham AL LLC
c/o CT Corporation System, Registered Agent
2 North Jackson Street - Suite 605
Montgomery, AL 36104

Contour Callington AL LLC
c/o CT Corporation System, Registered Agent
2 North Jackson Street - Suite 605
Montgomery, AL 36104

Contour Carlyle AL LLC
c/o CT Corporation System, Registered Agent
2 North Jackson Street - Suite 605
Montgomery, AL 36104

*/s/ N. Chris Glenos*
N. Christian Glenos

23